**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ABDI WALI DIRE,

*Defendant-Appellant.*

No. 11-4310

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

OFFICE OF THE FEDERAL PUBLIC DEFENDER,

*Amicus Supporting Appellant.*

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GABUL ABDULLAHI ALI,

*Defendant-Appellant.*

No. 11-4311

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

OFFICE OF THE FEDERAL PUBLIC DEFENDER,

*Amicus Supporting Appellant.*

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ABDI MOHAMMED UMAR,

*Defendant-Appellant.*

No. 11-4312

OFFICE OF THE FEDERAL PUBLIC DEFENDER,

*Amicus Supporting Appellant.*

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ABDI MOHAMMED GUREWARDHER,

*Defendant-Appellant.*

No. 11-4313

OFFICE OF THE FEDERAL PUBLIC DEFENDER,

*Amicus Supporting Appellant.*

UNITED STATES OF AMERICA,

            *Plaintiff-Appellee,*

        v.

MOHAMMED MODIN HASAN,

            *Defendant-Appellant.*

OFFICE OF THE FEDERAL PUBLIC
DEFENDER,

    *Amicus Supporting Appellant.*

No. 11-4317

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Mark S. Davis, District Judge.
(2:10-cr-00056-MSD-FBS-3; 2:10-cr-00056-MSD-FBS-2;
2:10-cr-00056-MSD-FBS-5; 2:10-cr-00056-MSD-FBS-4;
2:10-cr-00056-MSD-FBS-1)

Argued: September 20, 2011

Decided: May 23, 2012

Before KING, DAVIS, and KEENAN, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Davis and Judge Keenan joined.

**COUNSEL**

**ARGUED:** James R. Theuer, Norfolk, Virginia; Jon Michael Babineau, RIDDICK BABINEAU, PC, Norfolk, Virginia; David Wayne Bouchard, DAVID WAYNE BOUCHARD, Chesapeake, Virginia, for Appellants. Benjamin L. Hatch, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF**: William James Holmes, Virginia Beach, Virginia, for Appellant Gabul Abdullahi Ali; James E. Short, JAMES E. SHORT, PLC, Chesapeake, Virginia, for Appellant Abdi Mohammed Umar. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Joseph E. DePadilla, Assistant United States Attorney, John S. Davis, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. Michael S. Nachmanoff, Federal Public Defender, Geremy C. Kamens, Assistant Federal Public Defender, Jeffrey C. Corey, Research & Writing Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Amicus Supporting Appellants.

---

**OPINION**

KING, Circuit Judge:

In the early morning hours of April 1, 2010, on the high seas between Somalia and the Seychelles (in the Indian Ocean off the east coast of Africa), the defendants — Abdi Wali Dire, Gabul Abdullahi Ali, Abdi Mohammed Umar, Abdi Mohammed Gurewardher, and Mohammed Modin Hasan — imprudently launched an attack on the USS Nicholas, having confused that mighty Navy frigate for a vulnerable merchant ship. The defendants, all Somalis, were swiftly apprehended and then transported to the Eastern District of Virginia, where they were convicted of the crime of piracy, as proscribed by 18 U.S.C. § 1651, plus myriad other criminal offenses. In this

appeal, the defendants challenge their convictions and life-plus-eighty-year sentences on several grounds, including that their fleeting and fruitless strike on the Nicholas did not, as a matter of law, amount to a § 1651 piracy offense. As explained below, we reject their contentions and affirm.

I.

A.

According to the trial evidence, the USS Nicholas was on a counter-piracy mission in the Indian Ocean when, lit to disguise itself as a merchant vessel, it encountered the defendants shortly after midnight on April 1, 2010.[1] The Nicholas was approached by an attack skiff operated by defendant Hasan and also carrying defendants Dire and Ali, while defendants Umar and Gurewardher remained with a larger mothership some distance away. From their posts on the Nicholas, crew members could see by way of night-vision devices that Hasan was armed with a loaded rocket-propelled grenade launcher (commonly referred to as an "RPG"), and that Dire and Ali carried AK-47 assault rifles.

The captain of the USS Nicholas, Commander Mark Kesselring, directed his gunners to man their stations and prepare to fire, and ordered his unarmed personnel inside the skin of the ship for safety. When the defendants' attack skiff was within sixty feet of the Nicholas's fantail (its lowest and thus most accessible point), Dire and Ali discharged the first shots — bursts of rapid, automatic fire from their AK-47s aimed at the Nicholas and meant to attain its surrender. The Nicholas's crew responded in kind, resulting in an exchange of fire that lasted less than thirty seconds. Bullets from Dire and Ali's AK-47s struck the Nicholas near two of its crew members,

---

[1]We recite the evidence in the light most favorable to the government, as the prevailing party at trial. *See United States v. Singh*, 518 F.3d 236, 241 n.2 (4th Cir. 2008).

but the defendants' brief attack was (thankfully) casualty-free. Dire, Ali, and Hasan then turned their skiff and fled, with the Nicholas in pursuit.

During the chase, sailors on the USS Nicholas observed a flashing light on the horizon — a beacon from Umar and Gurewardher to lead the attack skiff back to the mothership. Commander Kesselring, however, managed to keep the Nicholas between the defendants' two vessels to thwart the attempted reunion. Meanwhile, Dire, Ali, and Hasan threw various items from the skiff overboard into the Indian Ocean, discarding the RPG, the AK-47s, and a ladder that would have enabled them to board the Nicholas. About thirty minutes into the pursuit, the Nicholas captured the three defendants in the skiff. Thereafter, the Nicholas chased and captured the two defendants in the mothership. A suspected second attack skiff, which had appeared on radar but did not close on the Nicholas, was never found.

The defendants' strike on the USS Nicholas was consistent with an accustomed pattern of Somali pirate attacks, designed to seize a merchant ship and then return with the vessel and its crew to Somalia, where a ransom would be negotiated and secured. Indeed, on April 4, 2010, during questioning aboard the Nicholas, the defendants separately confessed to participating willingly in a scheme to hijack a merchant vessel, and they provided details about their operation.

## B.

The grand jury in the Eastern District of Virginia returned a six-count indictment against the defendants on April 20, 2010, and a fourteen-count superseding indictment (the operative "Indictment") on July 7, 2010. The Indictment, which alleged facts consistent with the subsequent trial evidence, contained the following charges:

- Count One — Piracy as defined by the law of nations (18 U.S.C. § 1651);

- Count Two — Attack to plunder a vessel (18 U.S.C. § 1659);

- Count Three — Act of violence against persons on a vessel (18 U.S.C. §§ 2291(a)(6) and 2290(a)(2));

- Count Four — Conspiracy to perform an act of violence against persons on a vessel (18 U.S.C. §§ 2291(a)(9) and 2290(a)(2));

- Counts Five and Six — Assault with a dangerous weapon within a special maritime jurisdiction (18 U.S.C. § 113(a)(3));

- Counts Seven and Eight — Assault with a dangerous weapon on federal officers and employees (18 U.S.C. § 111(a)(1) and (b));

- Count Nine — Conspiracy involving a firearm and a crime of violence (18 U.S.C. § 924(o));

- Counts Ten and Eleven — Using, carrying, and possessing a firearm in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)(iii));

- Count Twelve — Using, carrying, and possessing a destructive device in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(ii));

- Count Thirteen — Carrying an explosive during the commission of a felony (18 U.S.C. § 844(h)(2)); and

- Count Fourteen — Conspiracy to carry an explo-

sive during the commission of a felony (18
U.S.C. § 844(m)).[2]

The Indictment identified the Eastern District of Virginia as
the proper venue under 18 U.S.C. § 3238, which provides that
"[t]he trial of all offenses begun or committed upon the high
seas . . . shall be in the district in which the offender, or any
one of two or more joint offenders, is arrested or is first
brought."

At the conclusion of an eleven-day trial, conducted
between November 9 and 24, 2010, the jury returned separate
verdicts of guilty against all defendants on all counts. The
sentencing hearing took place on March 14, 2011, and final
judgments were entered on March 18, 2011. The district court
dismissed Count Thirteen for being multiplicitous with Count
Twelve, and sentenced each of the defendants to life plus
eighty years (960 months) on the remaining convictions. Spe-
cifically, the court imposed mandatory life sentences for the
Count One piracy offense; concurrent sentences of 120
months each on Counts Two, Five, and Six, and of 240
months each on Counts Three, Four, Seven, Eight, Nine, and
Fourteen; plus consecutive sentences of 300 months each on
Counts Ten and Eleven, and of 360 months on Count Twelve.
The defendants have timely noted their appeals, and we pos-
sess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C.
§ 3742(a).

## II.

In these consolidated appeals, the defendants first contend
that their ill-fated attack on the USS Nicholas did not consti-
tute piracy under 18 U.S.C. § 1651, which provides in full:

---

[2]Counts One through Three, Five through Eight, and Ten through Thir-
teen included allegations of aiding and abetting. *See* 18 U.S.C. § 2(a)
("Whoever commits an offense against the United States or aids, abets,
counsels, commands, induces or procures its commission, is punishable as
a principal.").

> Whoever, on the high seas, commits the crime of piracy as defined by the law of nations, and is afterwards brought into or found in the United States, shall be imprisoned for life.

According to the defendants, the crime of piracy has been narrowly defined for purposes of § 1651 as robbery at sea, i.e., seizing or otherwise robbing a vessel. Because they boarded the Nicholas only as captives and indisputably took no property, the defendants contest their convictions on Count One, as well as the affixed life sentences.

## A.

The defendants' piracy contention is one that they unsuccessfully presented at multiple stages of the district court proceedings. Prior to their trial, the defendants moved to dismiss Count One under Rule 12 of the Federal Rules of Criminal Procedure. By its published opinion of October 29, 2010, the district court denied relief, premised on its determination that the Indictment "set forth facts that are sufficient, if proven true, to constitute the crime of piracy as defined by the law of nations, in violation of 18 U.S.C. § 1651." *United States v. Hasan*, 747 F. Supp. 2d 599, 602 (E.D. Va. 2010) ("*Hasan I*").[3] In so ruling, the court concluded — contrary to the defendants' posited robbery requirement — that piracy as defined by § 1651's incorporated law of nations encompasses, inter alia, acts of violence committed on the high seas for private ends. *See id.* at 640-42.

During the trial, at the close of the government's case-in-chief, Hasan renewed his motion to dismiss Count One, which the district court denied from the bench. The court also rejected the defendants' proposed jury instruction delineating

---

[3]Dire, having been the first to file, is the lead defendant in these consolidated appeals, but Hasan was the first named defendant in the district court proceedings.

the elements of the Count One piracy offense, in favor of an instruction consistent with its *Hasan I* opinion. Finally, following the trial, four of the defendants moved under Federal Rule of Criminal Procedure 29 for judgments of acquittal on Count One; the court denied those motions by its unpublished opinion of March 9, 2011. *See United States v. Hasan*, No. 2:10-cr-00056, slip op. at 2 (E.D. Va. Mar. 9, 2011) ("*Hasan II*").[4]

1.

The *Hasan I* opinion was issued on the heels of the August 17, 2010 published opinion in *United States v. Said*, 757 F. Supp. 2d 554 (E.D. Va. 2010) (Jackson, J.), wherein a different judge of the Eastern District of Virginia essentially took these defendants' view of the piracy offense by recognizing a robbery element. Like these defendants, the *Said* defendants have been charged with piracy under 18 U.S.C. § 1651 for attacking — but not seizing or otherwise robbing — a United States Navy ship. *See Said*, 757 F. Supp. 2d at 556-57 (describing indictment's allegations that, around 5:00 a.m. on April 10, 2010, *Said* defendants fired at least one shot on USS Ashland from skiff in Gulf of Aden). The *Said* court granted the defendants' pretrial motion, pursuant to Federal Rule of Criminal Procedure 12, to dismiss the piracy count from the indictment because no taking of property was alleged. *Id.* at 556.[5]

---

[4]Although the district court identified the four Rule 29 movants as Hasan, Gurewardher, Umar, and Ali, *see Hasan II*, slip op. at 3, the record reflects that they were Hasan, Gurewardher, Umar, and Dire. The *Hasan II* opinion is found at J.A. 1053-69. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in these appeals.)

[5]We heard oral argument in the government's interlocutory appeal from the *Said* opinion on March 25, 2011, and that same day ordered the parties to file supplemental briefs addressing the legal propriety of the procedure employed by the district court to dismiss the piracy count from the indictment. Thereafter, on April 20, 2011, we placed the *Said* appeal in abeyance pending our decision herein. Counsel for the *Said* defendants then

As the *Said* court recognized, article I of the Constitution accords Congress the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10 (the "Define and Punish Clause"). In its present form, the language of 18 U.S.C. § 1651 can be traced to an 1819 act of Congress, which similarly provided, in pertinent part:

> That if any person or persons whatsoever, shall, on the high seas, commit the crime of piracy, as defined by the law of nations, and such offender or offenders, shall afterwards be brought into or found in the United States, every such offender or offenders shall, upon conviction thereof, . . . be punished . . . .

*See* Act of Mar. 3, 1819, ch. 77, § 5, 3 Stat. 510, 513-14 (the "Act of 1819"). Whereas today's mandatory penalty for piracy is life imprisonment, however, the Act of 1819 commanded punishment "with death." *Id.* at 514. Examining the Act of 1819 in its *United States v. Smith* decision of 1820, the Supreme Court recognized:

> There is scarcely a writer on the law of nations, who does not allude to piracy, as a crime of a settled and determinate nature; and whatever may be the diversity of definitions, in other respects, all writers concur, in holding, that robbery, or forcible depredations upon the sea, *animo furandi*,[6] is piracy.

18 U.S. (5 Wheat.) 153, 161 (1820). Accordingly, the *Smith*

---

submitted an amicus curiae brief in support of the defendants in this appeal. In tandem with today's decision, we are issuing a per curiam opinion vacating the *Said* opinion and remanding for further proceedings. *See United States v. Said*, No. 10-4970, ___ F.3d ___ (4th Cir. 2012).

[6]The Latin term "*animo furandi*" means "with intention to steal." *Black's Law Dictionary* 87 (6th ed. 1990).

Court, through Justice Story, articulated "no hesitation in declaring, that piracy, by the law of nations, is robbery upon the sea." *Id.* at 162.

Invoking the principle that a court "must interpret a statute by its ordinary meaning at the time of its enactment," the *Said* court deemed *Smith* to be the definitive authority on the meaning of piracy under 18 U.S.C. § 1651. *See Said*, 757 F. Supp. 2d at 559 (citing *Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 275 (1994), for the proposition that courts "interpret Congress' use of [a] term . . . in light of [its] history, and presume Congress intended the phrase to have the meaning generally accepted in the legal community at the time of enactment"). The *Said* court noted that it was the first court since the 1800s to be tasked with "interpreting the piracy statute . . . as it applies to alleged conduct in international waters." *Id.* at 558. Looking to courts that have addressed the piracy statute post-*Smith* in other contexts, the *Said* court concluded that "the discernible definition of piracy as 'robbery or forcible depredations committed on the high seas' under § 1651 has remained consistent and has reached a level of concrete consensus in United S[t]ates law." *Id.* at 560.[7]

---

[7]In concluding that the definition of piracy under 18 U.S.C. § 1651 has remained unchanged since the Supreme Court disposed of *Smith* in 1820, the *Said* court cited only two modern decisions: *Taveras v. Taveraz*, 477 F.3d 767, 772 n.2 (6th Cir. 2007) (parental child abduction action brought under the Alien Tort Statute; observing that "[a] fundamental element of the offense of piracy is that the acts of robbery or depredation must have been committed *upon the high seas*," and rejecting piracy as a basis for jurisdiction because the underlying events "did not occur upon the high seas"); and *United States v. Madera-Lopez*, 190 F. App'x 832, 836 (11th Cir. 2006) (unpublished) (constitutional challenge to the Maritime Drug Law Enforcement Act; noting *Smith*'s declaration that "piracy, by the law of nations, is robbery upon the sea," in the course of deeming *Smith* unhelpful to Madera-Lopez's argument). The next most recent decision named by the *Said* court was issued in the late 1800s. *See United States v. Barnhart*, 22 F. 285, 288 (C.C.D. Or. 1884) (federal manslaughter pros-

The *Said* court also reviewed the legislative history of § 1651 and detected no congressional modifications to *Smith*'s definition of piracy. *See Said*, 757 F. Supp. 2d at 562. For example, the court observed that, "in 1948, Congress comprehensively revised all of Title 18 of the United S[t]ates Criminal Code," but "§ 1651 was not substantively updated." *Id.* "Indeed," the court noted, "the only substantive change to § 1651 since its enactment has been the removal of the death penalty for the offense as opposed to the current penalty of life imprisonment." *Id.*

Additionally, the *Said* court discerned support for a static definition of piracy under § 1651 from the existence of the statute criminalizing an attack to plunder a vessel, 18 U.S.C. § 1659, which provides:

> Whoever, upon the high seas or other waters within the admiralty and maritime jurisdiction of the United States, by surprise or open force, maliciously attacks or sets upon any vessel belonging to another, with an intent unlawfully to plunder the same, or to despoil any owner thereof of any moneys, goods, or merchandise laden on board thereof, shall be fined under this title or imprisoned not more than ten years, or both.

The court perceived that, because § 1659 targets "exactly the conduct charged against [the *Said* defendants] of shooting at the USS Ashland with an AK-47 rifle," it would be rendered redundant by extending the meaning of piracy under § 1651 to include that same violent conduct. *See Said*, 757 F. Supp.

---

ecution under "Indian country" jurisdiction; distinguishing the instant manslaughter offense, over which the federal courts possess exclusive jurisdiction, from "[p]iracy, or robbing on the high seas," a violation of the law of nations for which "the courts of every nation in the civilized world" have concurrent jurisdiction).

2d at 562-63 (observing, inter alia, that "two sections in the same chapter of the criminal code should not be construed such that one is made completely superfluous"). The court was also troubled by "the far-reaching consequence of" interpreting § 1651 and § 1659 to reach the same conduct, which could include "an act as minor as a sling-shot assault, a bow and arrow, or even throwing a rock at a vessel." *Id.* at 563. The court deemed it illogical, "in light of the ten year imprisonment penalty Congress promulgated for a violation of § 1659," that a defendant who committed such a minor act was meant to be exposed "to the penalty of life in prison for piracy under § 1651." *Id.*

Finally, although the *Said* court acknowledged contemporary international law sources defining piracy to encompass the *Said* defendants' violent conduct, the court deemed such sources to be too "unsettled" to be authoritative. *See Said*, 757 F. Supp. 2d at 563-66. The court further determined that relying on those international law sources would violate due process, explaining that, if "the definition of piracy [were adopted] from the[ ] debatable international sources whose promulgations evolve over time, defendants in United States courts would be required to constantly guess whether their conduct is proscribed by § 1651[,] render[ing] the statute unconstitutionally vague." *Id.* at 566. Thereby undeterred from employing the "clear and authoritative" definition in *Smith* "of piracy as sea robbery," the court dismissed the piracy count from the *Said* indictment. *Id.* at 567.

2.

Here, the district court took a different tack, as laid out in its sweeping *Hasan I* opinion denying these defendants' pretrial motion to dismiss the Count One piracy charge from their Indictment. That is, the court focused on piracy's unusual status as a crime defined by the law of nations and subject to universal jurisdiction.

a.

The district court began by recognizing that, "[f]or centuries, pirates have been universally condemned as *hostis humani generis* — enemies of all mankind — because they attack vessels on the high seas, and thus outside of any nation's territorial jurisdiction, . . . with devastating effect to global commerce and navigation." *Hasan I*, 747 F. Supp. 2d at 602. The court then turned its attention to the Define and Punish Clause, and specifically the potential "double redundancy [presented] by pairing 'Piracies' with 'Felonies committed on the high Seas' and 'Offences against the Law of Nations,' the latter two categories being broader groupings of offenses within which piracy was already included." *Id.* at 605 (quoting U.S. Const. art. I, § 8, cl. 10).

The district court perceived that, by nonetheless including "Piracies" in the Define and Punish Clause, the Framers distinguished that crime from "Felonies committed on the high Seas" and "Offences against the Law of Nations" — a sensible distinction to make in light of what would have been known to the Framers: "that piracy on the high seas was a unique offense because it permitted nations to invoke universal jurisdiction, such that any country could arrest and prosecute pirates in its domestic courts, irrespective of the existence of a jurisdictional nexus." *Hasan I*, 747 F. Supp. 2d at 605 (citing 4 William Blackstone, *Commentaries* *71 (describing piracy, in the mid-1700s, as an "offence against the universal law of society," "so that every community hath a right, by the rule of self-defence," to punish pirates); Eugene Kontorovich, *The "Define and Punish" Clause and the Limits of Universal Jurisdiction*, 103 Nw. U. L. Rev. 149, 164-67 (2009)). "Indeed, by the Eighteenth Century," as the district court observed, "the international crime of piracy was well established as the *only* universal jurisdiction crime." *Id.*; *see The Chapman*, 5 F. Cas. 471, 474 (N.D. Cal. 1864) (No. 2602) (quoting "the celebrated argument by Mr. (afterward Chief Justice) Marshall, in the Robbins Case," that "piracy,

under the law of nations, which alone is punishable by all nations, can only consist in an act which is an offense against all").

With that history in mind, the district court recognized that the Define and Punish Clause "accords to Congress the special power of criminalizing piracy in a manner consistent with the exercise of universal jurisdiction." *Hasan I*, 747 F. Supp. 2d at 605. The court further recognized, however, that Congress encountered early difficulties in criminalizing "general piracy" (that is, piracy in contravention of the law of nations), rather than solely "municipal piracy" (i.e., piracy in violation of United States law). *See id.* at 606. On the one hand, "[w]hile municipal piracy is flexible enough to cover virtually any overt act Congress chooses to dub piracy, it is necessarily restricted to those acts that have a jurisdictional nexus with the United States." *Id.* (citing *Dole v. New Eng. Mut. Marine Ins. Co.*, 7 F. Cas. 837, 847 (C.C.D. Mass. 1864) (No. 3966) (explaining that, although "many artificial offences have been created which are to be deemed to amount to piracy," "piracy created by municipal statute can only be tried by that state within whose territorial jurisdiction, on board of whose vessels, the offence thus created was committed")). On the other hand, "general piracy can be prosecuted by any nation, irrespective of the presence of a jurisdictional nexus." *Id.* (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 762 (2004) (Breyer, J., concurring in part and concurring in the judgment) ("[I]n the 18th century, nations reached consensus not only on the substantive principle that acts of piracy were universally wrong but also on the jurisdictional principle that any nation that found a pirate could prosecute him.")). Importantly, though, "because it is created by international consensus, general piracy is restricted in substance to those offenses that the international community agrees constitute piracy." *Id.*

The district court elucidated that, in the absence of federal common law power to apply the law of nations, "Congress had to enact a municipal law that adequately embodied the

international crime of piracy," requiring legislation "that was broad enough to incorporate the definition of piracy under the law of nations (and, in so doing, invoke universal jurisdiction) but narrow enough to exclude conduct that was beyond the scope of that definition." *Hasan I*, 747 F. Supp. 2d at 610. Congress's first effort in that regard, a 1790 act, proved unsuccessful. *See id.* at 612 (discussing Act of Apr. 30, 1790, ch. 9, § 8, 1 Stat. 112 (the "Act of 1790")). By Chief Justice Marshall's 1818 decision in *United States v. Palmer*, the Supreme Court ruled that — because the wording of the Act of 1790 evidenced an intent to criminalize "offences against the United States, not offences against the human race" — the Act did not "authorize the courts of the Union to inflict its penalties on persons who are not citizens of the United States, nor sailing under their flag, nor offending particularly against them." 16 U.S. (3 Wheat.) 610, 631 (1818). The *Palmer* decision thus announced the Act of 1790's failure to define piracy as a universal jurisdiction crime.

Within a year of *Palmer*, as the district court recounted, "Congress passed the Act of 1819 to make clear that it wished to proscribe not only piratical acts that had a nexus to the United States, but also piracy as an international offense subject to universal jurisdiction." *Hasan I*, 747 F. Supp. 2d at 612. Of course, the Act of 1819 "is nearly identical to" the current piracy statute, 18 U.S.C. § 1651. *See id.* at 614 ("The only significant difference between 18 U.S.C. § 1651 and § 5 of the Act of 1819 is the penalty prescribed: the former substitutes mandatory life imprisonment for death, the mandatory penalty prescribed by the latter."). In key part, both § 1651 and the Act of 1819 proscribe piracy simply "as defined by the law of nations."[8]

---

[8]Notably, "the effectiveness of the Act of 1819 was limited in duration to just one year, requiring supplemental legislation to prevent its provisions from expiring." *Hasan I*, 747 F. Supp. 2d at 613 (citing *United States v. Corrie*, 25 F. Cas. 658, 663 (C.C.D.S.C. 1860) (No. 14,869)). Hence, "Congress extended § 5 of the Act by" way of an 1820 act. *See id.* at 613-14 (discussing Act of May 15, 1820, ch. 113, § 2, 3 Stat. 600 (the "Act of 1820")). Additionally, §§ 4 and 5 of the Act of 1820 "condemned the slave trade as piracy, thereby attaching the universal opprobrium piracy had attained to the slave trade." *Id.* at 613.

The district court observed that Chapter 81 of Title 18, entitled "Piracy and Privateering," contains not only § 1651, but also other provisions condemning acts of piracy. *See Hasan I*, 747 F. Supp. 2d at 614. The court specifically cited 18 U.S.C. § 1659 (the statute criminalizing an attack to plunder a vessel), as well as § 1652 (deeming a "pirate" to be "a citizen of the United States [who] commits any murder or robbery, or any act of hostility against the United States, or against any citizen thereof, on the high seas, under color of any commission from any foreign prince, or state, or on pretense of authority from any person") and § 1653 (defining a "pirate" as "a citizen or subject of any foreign state [who] is found and taken on the sea making war upon the United States, or cruising against the vessels and property thereof, or of the citizens of the same, contrary to the provisions of any treaty existing between the United States and the state of which the offender is a citizen or subject, when by such treaty such acts are declared to be piracy"). Nevertheless, the court emphasized that those other statutes — unlike § 1651 — simply "proscribe[ ] piracy in the 'municipal' sense by dubbing various acts as piracy even though they may not necessarily fall within the definition of general piracy recognized by the international community." *Hasan I*, 747 F. Supp. 2d at 614.

b.

The district court in *Hasan I* astutely traced the meaning of "piracy" under the law of nations, from the time of the Act of 1819 to the modern era and the crime's codification at 18 U.S.C. § 1651. The court commenced with the Supreme Court's 1820 decision in *United States v. Smith*, relating that Justice Story easily concluded that "the Act of 1819 'sufficiently and constitutionally' defined piracy by expressly incorporating the definition of piracy under the law of nations." *See Hasan I*, 747 F. Supp. 2d at 616 (quoting *Smith*, 18 U.S. (5 Wheat.) at 162). The district court also recounted that, "[t]o ascertain how the law of nations defined piracy, the [*Smith*] Court consulted 'the works of jurists, writing pro-

fessedly on public law[s,] the general usage and practice of nations[, and] judicial decisions recognising and enforcing [the law of nations on piracy].'" *Id.* (fifth alteration in original) (quoting *Smith*, 18 U.S. (5 Wheat.) at 160-61). The *Smith* Court thereupon announced that "whatever may be the diversity of definitions, in other respects, all writers concur, in holding, that robbery, or forcible depredations upon the sea, *animo furandi*, is piracy." 18 U.S. (5 Wheat.) at 161; *see also id.* at 162 (expressing "no hesitation in declaring, that piracy, by the law of nations, is robbery upon the sea"). Further, because the *Smith* prisoner and his associates were, at the time they allegedly plundered and robbed a Spanish vessel, "free-booters, upon the sea," the Court deemed the case to be one of piracy punishable under the Act of 1819. *Id.* at 163.

Having noted that "[n]o other Supreme Court decision since *Smith* has directly addressed the definition of general piracy," and recognizing the necessity of looking to foreign sources to determine the law of nations, the district court then focused on case law from other countries. *See Hasan I*, 747 F. Supp. 2d at 614, 616 & n.16. The court deemed the Privy Council of England's 1934 decision in *In re Piracy Jure Gentium*,[9] [1934] A.C. 586 (P.C.), to be "[t]he most significant foreign case dealing with the question of how piracy is defined under international law." *Hasan I*, 747 F. Supp. 2d at 616.[10] There, the defendants were "a number of armed Chinese nationals" who, while "cruising in two Chinese junks" on

---

[9]The Latin term "*jure gentium*" means "[b]y the law of nations." *Black's Law Dictionary* 852 (6th ed. 1990). Thus, "piracy *jure gentium*" is another way of saying "general piracy."

[10]As the district court explained, "[t]he Privy Council served, in part, as an appeals court from the local courts in the various colonies of the British Empire," and "also reviewed disputed legal questions referred to it by the Crown and recommended resolutions for such questions." *Hasan I*, 747 F. Supp. 2d at 616 n.17 (citing Roget V. Bryan, Comment, *Toward the Development of a Caribbean Jurisprudence: The Case for Establishing a Caribbean Court of Appeal*, 7 J. Transnat'l L. & Pol'y 181, 183-84 (1998)).

the high seas, had chased a Chinese cargo vessel "for over half an hour, during which shots were fired by the attacking party." *See In re Piracy Jure Gentium*, [1934] A.C. at 587. Similar to the present case, however, those defendants were captured before accomplishing any robbery. *Id.* The defendants were transported to Hong Kong for trial and found guilty of piracy, but only subject to the question of the hour: "'Whether an accused person may be convicted of piracy in circumstances where no robbery has occurred.'" *Id.* at 587-88. Premised on the Full Court of Hong Kong's subsequent determination that a robbery was required, the defendants were ultimately acquitted. *Id.* at 588.

Though with no intent to disturb that judgment, the Privy Council revisited the issue upon referral from "His Majesty in Council." *See In re Piracy Jure Gentium*, [1934] A.C. at 588 ("The decision of the Hong Kong court was final and the present proceedings are in no sense an appeal from that Court, whose judgment stands."). The precise question before the Privy Council was "'whether actual robbery is an essential element of the crime of piracy jure gentium, or whether a frustrated attempt to commit a piratical robbery is not equally piracy jure gentium.'" *Id.* Significantly, the Privy Council answered: "'Actual robbery is not an essential element in the crime of piracy jure gentium. A frustrated attempt to commit a piratical robbery is equally piracy jure gentium.'" *Id.*

In so ruling, the Privy Council consulted a multitude of domestic and foreign authorities, including our Supreme Court's decision in *Smith*. *See In re Piracy Jure Gentium*, [1934] A.C. at 596-97. Rather than construing *Smith* to provide an "exhaustive" definition of piracy by equating it with robbery at sea, the Privy Council declared *Smith*'s piracy definition "unimpeachable as far as it goes," but confined "to the facts under consideration." *Id.* at 596 ("He would be a bold lawyer to dispute the authority of [Justice Story], but the criticism upon [*Smith*'s delineation of piracy] is that the learned judge was considering a case where . . . [t]here was no doubt

about the robbery . . . ."). Moreover, the Privy Council recognized that, while *Smith* is "typical" of authorities suggesting "that robbery is an essential ingredient of piracy," more recent cases compel "the opposite conclusion." *Id.* at 197. For example, the Privy Council cited *The Ambrose Light*, 25 F. 408 (S.D.N.Y. 1885) (concluding that vessel was properly seized for engaging in piratical expedition rather than lawful warfare), as "the American case . . . where it was decided . . . that an armed ship must have the authority of a State behind it, and if it has not got such an authority, it is a pirate even though no act of robbery has been committed by it." *In re Piracy Jure Gentium*, [1934] A.C. at 598. The Privy Council also explained that the respective timing of the competing authorities is of great consequence, in "that international law has not become a crystallized code at any time, but is a living and expanding branch of the law." *Id.* at 597. To substantiate its view that "piracy" under the law of nations had expanded beyond sea robbery (if it ever was so narrow), the Privy Council pointed to a 1926 League of Nations subcommittee report stating that, "according to international law, piracy consists in sailing the seas for private ends without authorization from the government of any State with the object of committing depredations upon property or acts of violence against persons." *Id.* at 599 (internal quotation marks omitted).

In addition to the Privy Council's *In re Piracy Jure Gentium* decision, the district court in *Hasan I* examined Kenya's 2006 *Republic v. Ahmed* prosecution of "ten Somali suspects captured by the United States Navy on the high seas" — "[t]he most recent case on [general piracy] outside the United States of which [the district court was] aware." *See Hasan I*, 747 F. Supp. 2d at 618. The High Court of Kenya affirmed the *Ahmed* defendants' convictions for piracy *jure gentium*, culling from international treaties a modern definition of piracy that encompasses acts of violence and detention. *See Hasan I*, 747 F. Supp. 2d at 618 (citing *Ahmed v. Republic*, Crim. App. Nos. 198, 199, 201, 203, 204, 205, 206 & 207 of 2008 (H.C.K. May 12, 2009) (Azangalala, J.)); *see also* James

Thuo Gathii, *Agora: Piracy Prosecution: Kenya's Piracy Prosecutions*, 104 Am. J. Int'l L. 416, 422 (2010) (describing allegations that *Ahmed* defendants hijacked Indian vessel and held its crew captive for two days).

As detailed in *Hasan I*, "there are two prominent international agreements that have directly addressed, and defined, the crime of general piracy." *See* 747 F. Supp. 2d at 618. The first of those treaties is the Geneva Convention on the High Seas (the "High Seas Convention"), which was adopted in 1958 and ratified by the United States in 1961, rendering the United States one of today's sixty-three parties to that agreement. The "starting point" for the High Seas Convention was *The Harvard Research in International Law Draft Convention on Piracy*, 26 Am. J. Int'l L. 743 (1932), "which sought to catalogue all judicial opinions on piracy and codify the international law of piracy." *Hasan I*, 747 F. Supp. 2d at 619. Under the High Seas Convention,

> [p]iracy consists of any of the following acts:
>
> (1)   Any illegal acts of violence, detention or any act of depredation, committed for private ends by the crew or the passengers of a private ship or a private aircraft, and directed:
>
> (a)   On the high seas, against another ship or aircraft, or against persons or property on board such ship or aircraft;
>
> (b)   Against a ship, aircraft, persons or property in a place outside the jurisdiction of any State;
>
> (2)   Any act of voluntary participation in the operation of a ship or of an aircraft with knowledge of facts making it a pirate ship or aircraft;

(3)  Any act of inciting or of intentionally facili-
tating an act described in sub-paragraph 1 or sub-
paragraph 2 of this article.

Geneva Convention on the High Seas, art. 15, *opened for sig-
nature* Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 11
(entered into force Sept. 30, 1962).

The second pertinent treaty is the United Nations Conven-
tion on the Law of the Sea (the "UNCLOS"), which has
amassed 162 parties since 1982 — albeit not the United
States, which has not ratified the UNCLOS "but has recog-
nized that its baseline provisions reflect customary interna-
tional law." *See United States v. Alaska*, 503 U.S. 569, 588
n.10 (1992) (internal quotation marks omitted); *see also
Hasan I*, 747 F. Supp. 2d at 619 (explaining that United States
has not ratified UNCLOS due to disagreement with deep sea-
bed mining provisions unrelated to piracy (citing 1 Thomas J.
Schoenbaum, *Admiralty and Maritime Law* § 2-2 (4th ed.
2004)). Relevant here, the UNCLOS provides that

[p]iracy consists of any of the following acts:

(a)  any illegal acts of violence or detention, or any
act of depredation, committed for private ends
by the crew or the passengers of a private ship
or a private aircraft, and directed:

(i)  on the high seas, against another ship
or aircraft, or against persons or prop-
erty on board such ship or aircraft;

(ii)  against a ship, aircraft, persons or
property in a place outside the juris-
diction of any State;

(b)  any act of voluntary participation in the opera-
tion of a ship or of an aircraft with knowledge
of facts making it a pirate-ship or aircraft;

      (c)   any act of inciting or of intentionally facilitating an act described in subparagraph (a) or (b).

U.N. Convention on the Law of the Sea, art. 101, *opened for signature* Dec. 10, 1982, 1833 U.N.T.S. 397 (entered into force Nov. 16, 1994). Upon comparing the High Seas Convention with the UNCLOS, the district court in *Hasan I* recognized that the latter treaty "defines piracy in exactly the same terms as the [former agreement], with only negligible stylistic changes." *See* 747 F. Supp. 2d at 620. The court also observed that the UNCLOS "represents the most recent international statement regarding the definition . . . of piracy." *Id.*

c.

Turning to the contentions of the parties herein, the district court related the defendants' position "that the authoritative definition of piracy under the law of nations, and thus within the meaning of 18 U.S.C. § 1651, is provided by the Supreme Court's decision in *Smith*." *Hasan I*, 747 F. Supp. 2d at 620-21. According to the defendants, because their Indictment did not allege "that they committed any actual robbery on the high seas," the Count One piracy charge had to be dismissed. *Id.* at 621. For its part, however, the government defended Count One on the premise "that *Smith* neither foreclosed the possibility that piracy included conduct other than robbery nor precluded the possibility that the definition of piracy under the law of nations might later come to include conduct other than robbery." *Id.* In response, the district court recognized that "if the definition of piracy under the law of nations can evolve over time, such that the modern law of nations must be applied, rather than any recitation of the state of the law in the early Nineteenth Century," the court need not determine "[w]hether *Smith* was limited to its facts and not intended to be exhaustive, or whether its description of piracy was exhaustive but only represented the definition of piracy accepted at that time by the international community." *Id.* at 622. The court then embarked on the relevant analysis.

First, the district court interpreted 18 U.S.C. § 1651 as an unequivocal demonstration of congressional intent "to incorporate . . . any subsequent developments in the definition of general piracy under the law of nations." *Hasan I*, 747 F. Supp. 2d at 623. The court rationalized:

> The plain language of 18 U.S.C. § 1651 reveals that, in choosing to define the international crime of piracy by [reference to the "law of nations"], Congress made a conscious decision to adopt a flexible — but at all times sufficiently precise — definition of general piracy that would automatically incorporate developing international norms regarding piracy. Accordingly, Congress necessarily left it to the federal courts to determine the definition of piracy under the law of nations based on the international consensus at the time of the alleged offense.

*Id.* (citing *Ex parte Quirin*, 317 U.S. 1, 29-30 (1942), where the Supreme Court reiterated its 1820 ruling in *Smith* that "[a]n Act of Congress punishing 'the crime of piracy, as defined by the law of nations' is an appropriate exercise of its constitutional authority to 'define and punish' the offense, since it has adopted by reference the sufficiently precise definition of international law" (citations omitted)). The district court further gleaned that Congress intended to adopt "a flexible definition for general piracy" from the history of § 1651 — especially the passage of its forerunner Act of 1819 in the wake of the Supreme Court's 1818 *Palmer* decision quelling any notion that general piracy had been, up to that time, sufficiently defined and proscribed by domestic statutory law. *See Hasan I*, 747 F. Supp. 2d at 623-24. The court noted that *Palmer* highlighted Congress's powerlessness to "control the contours of general piracy," in "that developing international norms may alter the offense's accepted definition, albeit at a glacial pace." *Id.* at 624. Thus, according to the court, the Act of 1819's simple incorporation of the law of nations made sense, because it relieved Congress of "having to revise the

general piracy statute continually to mirror the international consensus definition." *Id.* As written, the Act of 1819, and now 18 U.S.C. § 1651, "automatically incorporate[ ]" advancements "in the definition of general piracy under the law of nations." *Id.*[11]

"Having concluded that Congress's proscription of 'piracy as defined by the law of nations' in 18 U.S.C. § 1651 necessarily incorporates modern developments in international law," the district court next endeavored to "discern the definition of piracy under the law of nations at the time of the alleged offense in April 2010." *Hasan I*, 747 F. Supp. 2d at 630. In so doing, the court observed that the law of nations is ascertained today via the same path followed in 1820 by the Supreme Court in *Smith*: consultation of "'the works of

---

[11]The district court noted that reading 18 U.S.C. § 1651 to require application of the contemporary definition of general piracy comports with both fundamental fairness and Supreme Court precedent. That is, it "would be fundamentally unfair" to "permit[ ] the prosecution of acts that have ceased to be violations of the law of nations" — such as acts occurring outside the three-mile boundary demarcating a nation's territorial waters from the high seas in 1820, but within the twelve-mile boundary set by international law today. *See Hasan I*, 747 F. Supp. 2d at 625. Moreover, an assemblage of Supreme Court decisions "demonstrates that use of the phrase 'law of nations' contemplates a developing set of international norms." *See id.* at 625-29 (discussing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724-25 (2004) (explaining that the Alien Tort Statute's "jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time [including piracy]," but allowing that courts may recognize additional common law claims "based on the present-day law of nations"); *United States v. Arjona*, 120 U.S. 479, 484-86 (1887) (extending the longstanding obligation under the law of nations "of one nation to punish those who within its own jurisdiction counterfeit the money of another nation," to a duty to protect the "more recent custom among bankers of dealing in foreign securities"); *The Antelope*, 23 U.S. (10 Wheat.) 66, 120-22 (1825) (ruling that the slave trade, though "contrary to the law of nature," was then "consistent with the law of nations," but acknowledging that "[a] right . . . vested in all, by the consent of all, can be divested . . . by consent")).

jurists, writing professedly on public law[s];'" consideration of "'the general usage and practice of nations;'" and contemplation of "'judicial decisions recognising and enforcing that law.'" *See Hasan I*, 747 F. Supp. 2d at 630 (quoting *Smith*, 18 U.S. (5 Wheat.) at 160-61). Engaging in that analysis, the court concluded:

> As of April 1, 2010, the law of nations, also known as customary international law, defined piracy to *include* acts of violence committed on the high seas for private ends without an actual taking. More specifically, . . . the definition of general piracy under modern customary international law is, at the very least, reflected in Article 15 of the 1958 High Seas Convention and Article 101 of the 1982 UNCLOS.

*Id.* at 632-33; *see also id.* at 630 ("Today, 'the law of nations has become synonymous with the term "customary international law," which describes the body of rules that nations in the international community universally abide by, or accede to, out of a sense of legal obligation and mutual concern.'" (quoting *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 116 (2d Cir. 2008))). Narrowing customary international law to one of those two treaties, the court chose the UNCLOS, which — in addition to "contain[-ing] a definition of general piracy that is, for all practical purposes, identical to that of the High Seas Convention" — "has many more states parties than the High Seas Convention" and "has been much more widely accepted by the international community than the High Seas Convention." *Id.* at 633 (footnote omitted).

In the course of its discussion of the High Seas Convention and the UNCLOS, the district court recognized that "'[t]reaties are proper evidence of customary international law because, and insofar as, they create legal obligations akin to contractual obligations on the States parties to them.'" *Hasan I*, 747 F. Supp. 2d at 633 (quoting *Kiobel v. Royal Dutch*

*Petroleum Co.*, 621 F.3d 111, 137 (2d Cir. 2010)). According to the court, "[w]hile all treaties shed some light on the customs and practices of a state, 'a treaty will only constitute sufficient proof of a norm of customary international law if an overwhelming majority of States have ratified the treaty, and those States uniformly and consistently act in accordance with its principles.'" *Id.* (emphasis omitted) (quoting *Kiobel*, 621 F.3d at 137). "In this regard," the court emphasized, "it is also important to understand that a treaty can either 'embod[y] or create[ ] a rule of customary international law,' and such a rule 'applies beyond the limited subject matter of the treaty and *to nations that have not ratified it*.'" *Id.* (alterations in original) (quoting *Kiobel*, 621 F.3d at 138). With those principles in mind, the court recognized:

> There were 63 states parties to the High Seas Convention as of June 10, 2010, including the United States, and there were 161 states parties to UNCLOS (including the European Union) as of October 5, 2010, including Somalia. The 161 states parties to UNCLOS represent the "overwhelming majority" of the 192 Member States of the United Nations, and the 194 countries recognized by the United States Department of State. UNCLOS's definition of piracy therefore represents a widely accepted norm, followed out of a sense of agreement (or, in the case of the states parties, treaty obligation), that has been recognized by an overwhelming majority of the world.
>
> The status of UNCLOS as representing customary international law is enhanced by the fact that the states parties to it include all of the nations bordering the Indian Ocean on the east coast of Africa, where the incident in the instant case is alleged to have taken place: South Africa, Mozambique, Tanzania, Kenya, and Somalia. *See Kiobel*, 621 F.3d at 137-38 (noting that a treaty's evidentiary value for assessing

customary international law depends on the number of parties and the parties' relative influence on the international issue). Also significant in determining whether UNCLOS constitutes sufficient proof of a norm of customary international law is the fact that both the United States and Somalia, two countries that clearly have an influence on the piracy issue, have each ratified, and thus accepted, a treaty containing the exact same definition of general piracy.

Moreover, although the definition of general piracy provided by the High Seas Convention and UNCLOS is not nearly as succinct as "robbery on the sea," the definitions are not merely general aspirational statements, but rather specific enumerations of the elements of piracy reflecting the modern consensus view of international law. Accordingly, UNCLOS's definition of general piracy has a norm-creating character and reflects an existing norm of customary international law that is binding on even those nations that are not a party to the Convention, including the United States.

*Hasan I*, 747 F. Supp. 2d at 633-34 (footnote and citations omitted).[12]

---

[12]Expounding on the applicability of the UNCLOS herein, the district court observed:

The fact that the United States has not signed or ratified UNCLOS does not change the conclusion reached above regarding its binding nature. While the United States' failure to sign or ratify UNCLOS does bar the application of UNCLOS as *treaty law* against the United States, it is not dispositive of the question of whether UNCLOS constitutes customary international law, because such a determination relies not only on the practices and customs of the United States, but instead of the entire international community. In any event, while the United States has refused to sign UNCLOS because of . . . regulations related to deep seabed exploration and mining, in 1983, President Ronald

The district court further observed "that UNCLOS does not represent the first time that acts of violence have been included in the definition of general piracy." *Hasan I*, 747 F. Supp. 2d at 635. Rather, even accepting that "actual robbery on the high seas" was once an essential element of general piracy, "the view that general piracy does not require an actual robbery on the sea has certainly gained traction since the Nineteenth Century, as evidenced by [intervening case law], the Harvard Draft Convention on Piracy, the High Seas Convention, and UNCLOS." *Id.* The court took especial note of Kenya's recent reliance on the UNCLOS to define general piracy in the 2006 *Republic v. Ahmed* case, concluding:

> Reagan announced that the United States would accede to those provisions of UNCLOS pertaining to "traditional uses" of the ocean. Schoenbaum, *supra*, § 2-2 ("With respect to the 'traditional uses' of the sea, therefore, the United States accepts [UNCLOS] as customary international law, binding upon the United States."). No succeeding Presidential Administration has taken a contrary position. Accordingly, with the exception of its deep seabed mining provisions, the United States has consistently accepted UNCLOS as customary international law for more than 25 years. [*See* Restatement (Third) of the Foreign Relations Law of the United States pt. 5, intro. note (1986) ("For purposes of this Restatement, [the UNCLOS] as such is not law of the United States. However, many of the provisions of the [UNCLOS] follow closely provisions in the [High Seas Convention] to which the United States is a party and which largely restated customary law as of that time. [Moreover], by express or tacit agreement accompanied by consistent practice, the United States, and states generally, have accepted the substantive provisions of the [UNCLOS], other than those addressing deep sea-bed mining, as statements of customary law binding upon them apart from the [UNCLOS].")].

*Hasan I*, 747 F. Supp. 2d at 634-35 (citations omitted). The court also addressed the defendants' assertion "that the significance of the accession by the United States to the High Seas Convention is diminished by the fact that implementing legislation was never adopted by Congress." *Id.* at 633 n.30. According to the court, the lack of implementing legislation was unimportant, because "it does not diminish the wide acceptance of the general piracy definition by the international community." *Id.*

This actual state practice by Kenya, the country currently most involved in prosecuting piracy, as well as the active support of such practice by other nations, which continue to bring other alleged pirates to Kenya for prosecution, is indicative of the fact that the definition of piracy contained in the High Seas Convention and UNCLOS have attained the status of a binding rule of customary international law.

*Hasan I*, 747 F. Supp. 2d at 636. Additionally, the court recognized that "[c]ontemporary scholarly sources . . . appear to agree that the definition of piracy in UNCLOS represents customary international law." *Id.* at 636 & n.32 (citing pertinent works of scholars). "While writers on the issue do present disagreements regarding the definition of general piracy," the court acknowledged, "such disagreements do not implicate the core definition provided in UNCLOS." *Id.* at 637 (explaining that "writers [instead] disagree about the outer boundaries of the definition of general piracy, such as whether UNCLOS's requirement of 'private ends' prohibits its application to terrorist activities, or whether piracy can arise in situations involving just one ship rather than two").

Significantly, the district court rejected the defendants' contention — endorsed by the *Said* court — that the piracy statute, 18 U.S.C. § 1651, "cannot be read to include mere acts of violence committed in an effort to rob another vessel on the high seas, because doing so would render . . . superfluous" the attack-to-plunder-a-vessel statute, 18 U.S.C. § 1659. *See Hasan I*, 747 F. Supp. 2d at 637. The court in *Hasan I* articulated that, although the defendants were "correct in their assertion that reading § 1651 to include acts of violence without an actual taking would render punishable as general piracy acts that also fall within § 1659," the defendants defectively ignored "the distinct jurisdictional scopes provided by § 1651 and § 1659." *Id.* That is, "[w]hile § 1659 applies only to acts by United States citizens or foreign nationals 'set[ting]

upon' U.S. citizens or U.S. ships, § 1651 provides for the prosecution of general piracy (as opposed to municipal piracy) with the ability to invoke universal jurisdiction. Therefore, 18 U.S.C. § 1659 is not superfluous." *Id.* (second alteration in original).

The *Hasan I* opinion further rejected the *Said*-approved theory "that applying the contemporary customary international law definition of general piracy violates fundamental due process protections." *See Hasan I*, 747 F. Supp. 2d at 637-38 ("In short, Defendants contend that construing § 1651 to demand a flexible definition of general piracy reflecting developing international norms would necessarily subject them to punishment for crimes that are unconstitutionally vague."). According to *Hasan I*, "§ 1651's express incorporation of the definition of piracy provided by 'the law of nations,' which is today synonymous with customary international law, provides fair warning of what conduct is proscribed by the statute." *Id.* at 638. In support of that conclusion, the district court in *Hasan I* recapped the Supreme Court's 1820 holding in *Smith* "that, by incorporating the definition of piracy under the law of nations, Congress had proscribed general piracy as clearly as if it had enumerated the elements of the offense in the legislation itself." *Hasan I*, 747 F. Supp. 2d at 639 (citing *Smith*, 18 U.S. (5 Wheat.) at 159-60). The district court also determined that the "reasoning in *Smith* applies equally to the application of § 1651 today," explaining:

> [I]n order for a definition of piracy to fall within the scope of § 1651, the definition must . . . be sufficiently established to become customary international law. Importantly, the high hurdle for establishing customary international law, namely the recognition of a general and consistent practice among the overwhelming majority of the international community, necessarily imputes to Defendants fair warning of what conduct is forbidden under

§ 1651. Such general and consistent practice is cer-
tainly reflected by the fact that an overwhelming
majority of countries have ratified UNCLOS, which
reflects the modern definition of general piracy. Just
as the Supreme Court found in *Smith* that the defini-
tion of piracy was readily ascertainable, it is appar-
ent today that UNCLOS (to which Somalia acceded
in 1989, over twenty years ago) reflects the defini-
tive modern definition of general piracy under cus-
tomary international law. In fact, while the Court
recognizes the difference between imputed and
actual notice for due process purposes, it is far more
likely that the Defendants, who claim to be Somali
nationals, would be aware of the piracy provisions
contained in UNCLOS, to which Somalia is a party,
than of *Smith*, a nearly two hundred year-old case
written by a court in another country literally half a
world away.

*Hasan I*, 747 F. Supp. 2d at 639. Summarizing "'[t]hat is cer-
tain which is, by necessary reference, made certain,'" the dis-
trict court reiterated that § 1651's definition of general piracy
was rendered "certain" by the statute's incorporation of the
law of nations. *Id.* (alteration in original) (quoting *Smith*, 18
U.S. (5 Wheat.) at 159-60).

d.

For its final *Hasan I* undertaking, the district court mea-
sured the Count One piracy charge in the defendants' Indict-
ment against "the statutory requirements set forth in 18 U.S.C.
§ 1651," including "the necessarily incorporated elements of
general piracy established by customary international law."
*Hasan I*, 747 F. Supp. 2d at 640. The court recognized that the
defendants' motion to dismiss Count One turned on § 1651's
first condition (that the defendants "committed the act of
'piracy as defined by the law of nations'"), and not its second
and third requirements (respectively, that the piracy was com-

mitted "'on the high seas'" and that the defendants thereafter were "'brought into or found in the United States'"). *Id.*

The district court then reaffirmed that, as of the alleged offense date of April 2010, the definition of piracy under the law of nations was found in the substantively identical High Seas Convention and UNCLOS, the latter having "been accepted by the overwhelming majority of the world as reflecting customary international law." *Hasan I*, 747 F. Supp. 2d at 640. Mirroring those treaties, the court pronounced that "piracy within the meaning of [§] 1651 consists of any of the following acts and their elements:"

(A)  (1) any illegal act of violence or detention, or any act of depredation; (2) committed for private ends; (3) on the high seas or a place outside the jurisdiction of any state; (4) by the crew or the passengers of a private ship . . . ; (5) and directed against another ship . . . , or against persons or property on board such ship . . . ; or

(B)  (1) any act of voluntary participation in the operation of a ship . . . ; (2) with knowledge of the facts making it a pirate ship; or

(C)  (1) any act of inciting or of intentionally facilitating (2) an act described in subparagraph (A) or (B).

*Id.* at 640-41 (footnotes omitted).

The district court concluded that defendants Ali and Dire were adequately charged in Count One under subparagraph (A), in that the Indictment alleged "that, while on the high seas, they boarded an assault boat, cruised towards the USS Nicholas, and opened fire upon the Navy frigate with AK-47s." *Hasan I*, 747 F. Supp. 2d at 641. As for defendant

Hasan, the court suggested that subparagraphs (A), (B), and (C) authorized the piracy charge against him, because he allegedly "boarded [the] assault boat with an RPG, with co-conspirators Ali and Dire carrying AK-47s, and cruised towards the USS Nicholas, where Ali and Dire opened fire on the USS Nicholas with their AK-47s." *Id.* (ruling that the Indictment "adequately charges Hasan with general piracy as a voluntary and knowing participant in Ali and Dire's assault"). Finally, the court sustained Count One against defendants Gurewardher and Umar under subparagraphs (B) and (C), premised on the allegation "that they maintained the seagoing vessel[ ] from which the assault boat carrying Hasan, Ali, and Dire was launched, while their co-conspirators set out to attack the USS Nicholas." *Id.* The matter then proceeded to trial, where the government adduced evidence consistent with the facts alleged in the Indictment.

3.

Faithful to its *Hasan I* opinion, the district court instructed the jury on Count One, over the defendants' objection,

> that the Law of Nations defines the crime of piracy to [include] any of the three following actions:
>
> (A) any illegal acts of violence or detention or any act of depredation committed for private ends on the high seas or a place outside the jurisdiction of any state by the crew or the passengers of a private ship and directed against another ship or against persons or property on board such ship; or
>
> (B) any act of voluntary participation in the operation of a ship with knowledge of facts making it a pirate ship; or
>
> (C) any act of inciting or of intentionally facilitating an act described in (A) or (B) above.

Excerpt of Proceedings (Jury Instructions) at 18-19, *United States v. Hasan*, No. 2:10-cr-00056 (E.D. Va. Nov. 22, 2010; filed July 28, 2011), ECF No. 356. The court also specified "that an assault with a firearm as alleged in the indictment in this case, if proven beyond a reasonable doubt, is an illegal act of violence." *Id.* at 19.[13] The jury found each of the defendants guilty of the Count One piracy offense by a general verdict.

Rebuffing the post-trial entreaties for judgments of acquittal on Count One, the district court observed in its *Hasan II* opinion of March 9, 2011, that it was being asked to "reconsider its decision regarding the definition of 'piracy,' as used in 18 U.S.C. § 1651, in light of a Congressional Research Service ('CRS') report entitled *Piracy: A Legal Definition*." *See Hasan II*, slip op. at 3. The CRS report was issued on October 19, 2010 — just ten days prior to the filing of *Hasan I* — and had not been considered by the district court in rendering that earlier decision. *See id.* at 3-4 & n.1 (attributing its non-contemplation of the CRS report to the fact that such "reports, though public domain materials, are generally not made directly available to the public [or] to the federal courts[,] but instead only become public when released by a member of Congress"). In any event, the court deemed the CRS report unhelpful to the defendants, explaining:

> [T]he report does not appear to contain discussion of any relevant historical precedent that was not also discussed by the Court in its [*Hasan I* opinion]. Neither does the report appear to contain any original substantive legal analysis regarding the proper definition of piracy under the law of nations. Instead, the report merely discusses the fact that "[a] recent

---

[13]The defendants proposed an instruction defining piracy as "'robbery, or forcible depredations upon the sea,'" and requiring the government to prove that, among other things, the defendants "took and carried away the personal goods of another." J.A. 585.

development in a piracy trial in federal court in Nor-
folk, VA" — namely, the decision in *United States
v. Said*, [757 F. Supp. 2d 554 (E.D. Va. 2010)] —
"has highlighted a potential limitation in the defini-
tion of piracy under the United States Code."

*Id.* at 4 (quoting R. Chuck Mason, Cong. Research Serv.,
R41455, *Piracy: A Legal Definition* summ. (Oct. 19, 2010)).
Because the court "was, of course, well aware of the decision
in *Said* when it issued its [*Hasan I* opinion]," it concluded that
the CRS report "provide[d] no basis for [reconsideration of]
the definition of piracy under the law of nations as used in 18
U.S.C. § 1651." *Id.* at 4-5.[14] Having found no meritorious
premise for relief, the court validated the defendants' Count
One piracy convictions. *See id.* at 5-6, 16-17.

## B.

On appeal, the defendants maintain that the district court
erred with respect to Count One both by misinstructing the
jury on the elements of the piracy offense, and in refusing to
award post-trial judgments of acquittal. Each aspect of the
defendants' position obliges us to assess whether the court
took a mistaken view of 18 U.S.C. § 1651 and the incorpo-
rated law of nations. *See United States v. Kellam*, 568 F.3d
125, 132 (4th Cir. 2009) (observing that we "review de novo
a district court's ruling on a motion for a judgment of acquit-
tal"); *United States v. Singh*, 518 F.3d 236, 249, 251 (4th Cir.
2008) (recognizing that we "review a trial court's jury instruc-
tions for abuse of discretion," and that "a district court abuses
its discretion when it makes an error of law" (internal quota-
tion marks omitted)).

---

[14]It is noteworthy that the CRS report of October 19, 2010, was updated
to include a discussion of the *Hasan I* opinion. *See* R. Chuck Mason,
Cong. Research Serv., R41455, *Piracy: A Legal Definition* summ. (Dec.
13, 2010) (advising that "[t]he divergent U.S. district court rulings [in *Said*
and *Hasan I*] may create uncertainty in how the offense of piracy is
defined").

Simply put, we agree with the conception of the law outlined by the court below. Indeed, we have carefully considered the defendants' appellate contentions — endorsed by the amicus curiae brief submitted on their behalf, *see supra* note 5 — yet remain convinced of the correctness of the trial court's analysis.

The crux of the defendants' position is now, as it was in the district court, that the definition of general piracy was fixed in the early Nineteenth Century, when Congress passed the Act of 1819 first authorizing the exercise of universal jurisdiction by United States courts to adjudicate charges of "piracy as defined by the law of nations." Most notably, the defendants assert that the "law of nations," as understood in 1819, is not conterminous with the "customary international law" of today. The defendants rely on Chief Justice Marshall's observation that "[t]he law of nations is a law founded on the great and immutable principles of equity and natural justice," *The Venus*, 12 U.S. (8 Cranch) 253, 297 (1814) (Marshall, C.J., dissenting), to support their theory that "[t]he Congress that enacted the [Act of 1819] did not view the universal law of nations as an evolving body of law." Br. of Appellants 12; *see also* Br. of Amicus Curiae 11 (arguing that, in 1819, "'the law of nations' was well understood to refer to an immutable set of obligations — not evolving practices of nations or future pronouncements of international organizations that did not yet exist").

The defendants' view is thoroughly refuted, however, by a bevy of precedent, including the Supreme Court's 2004 decision in *Sosa v. Alvarez-Machain*. *See supra* note 11. The *Sosa* Court was called upon to determine whether Alvarez could recover under the Alien Tort Statute, 28 U.S.C. § 1350 (the "ATS"), for the U.S. Drug Enforcement Administration's instigation of his abduction from Mexico for criminal trial in the United States. *See* 542 U.S. at 697. The ATS provides, in full, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in

violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Significantly, the ATS predates the criminalization of general piracy, in that it was passed by "[t]he first Congress . . . as part of the Judiciary Act of 1789." *See Sosa*, 542 U.S. at 712-13 (citing Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 77 (authorizing federal district court jurisdiction over "all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States")). Yet the *Sosa* Court did not regard the ATS as incorporating some stagnant notion of the law of nations. Rather, the Court concluded that, while the first Congress probably understood the ATS to confer jurisdiction over only the three paradigmatic law-of-nations torts of the time — including piracy — the door was open to ATS jurisdiction over additional "claim[s] based on the present-day law of nations," albeit in narrow circumstances. *See id.* at 724-25. Those circumstances were lacking in the case of Alvarez, whose ATS claim could not withstand being "gauged against the current state of international law." *See id.* at 733.

Although, as the defendants point out, the ATS involves civil claims and the general piracy statute entails criminal prosecutions, there is no reason to believe that the "law of nations" evolves in the civil context but stands immobile in the criminal context. Moreover, if the Congress of 1819 had believed either the law of nations generally or its piracy definition specifically to be inflexible, the Act of 1819 could easily have been drafted to specify that piracy consisted of "piracy as defined *on March 3, 1819* [the date of enactment], by the law of nations," or solely of, as the defendants would have it, "robbery upon the sea." The government helpfully identifies numerous criminal statutes "that incorporate a definition of an offense supplied by some other body of law that may change or develop over time," *see* Br. of Appellee 18 (citing, inter alia, 16 U.S.C. § 3372(a)(2)(A) (the Lacey Act, prohibiting commercial activities involving "any fish or wildlife taken, possessed, transported, or sold in violation of any law or any regulation of any State or in violation of any for-

eign law")); that use the term "as defined by" or its equivalent to "incorporate definitions that are subject to change after statutory enactment," *see id.* at 19 (citing, e.g., 18 U.S.C. § 1752(b)(1)(B) (prescribing punishment for illegal entry into White House or other restricted buildings or grounds where "the offense results in significant bodily injury as defined by [18 U.S.C. § 2218(e)(3)]")); and that explicitly "tie the statutory definition to a particular time period," *see id.* at 21 (citing 22 U.S.C. § 406 (exempting from statutory limitations on the export of war materials "trade which might have been lawfully carried on before the passage of this title [enacted June 15, 1917], under the law of nations, or under the treaties or conventions entered into by the United States, or under the laws thereof")). Additionally, the government underscores that Congress has explicitly equated piracy with "robbery" in other legislation, including the Act of 1790 that failed to define piracy as a universal jurisdiction crime.

For their part, the defendants highlight the Assimilated Crimes Act (the "ACA") as a statute that expressly incorporates state law "in force at the time of [the prohibited] act or omission." *See* 18 U.S.C. § 13(a). That reference was added to the ACA, however, only after the Supreme Court ruled that a prior version was "limited to the laws of the several states in force at the time of its enactment," *United States v. Paul*, 31 U.S. (6 Pet.) 141, 142 (1832) — a limitation that the Court has not found in various other statutes incorporating outside laws and that we do not perceive in 18 U.S.C. § 1651's proscription of "piracy as defined by the law of nations."

Additional theories posited by the defendants of a static piracy definition are no more persuasive. For example, the defendants contend that giving "piracy" an evolving definition would violate the principle that there are no federal common law crimes. *See* Br. of Appellants 32 (citing *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812), for the proposition "that federal courts have no power to exercise 'criminal jurisdiction in common-law cases'"). The 18 U.S.C. § 1651 piracy

offense cannot be considered a common law crime, however, because Congress properly "ma[de] an act a crime, affix[ed] a punishment to it, and declare[d] the court that shall have jurisdiction of the offence." *See Hudson*, 11 U.S. (7 Cranch) at 34. Moreover, in its 1820 *Smith* decision, the Supreme Court unhesitatingly approved of the piracy statute's incorporation of the law of nations, looking to various sources to ascertain how piracy was defined under the law of nations. *See Smith*, 18 U.S. (5 Wheat.) at 159-61.

The defendants would have us believe that, since the *Smith* era, the United States' proscription of general piracy has been limited to "robbery upon the sea." But that interpretation of our law would render it incongruous with the modern law of nations and prevent us from exercising universal jurisdiction in piracy cases. *See Sosa*, 542 U.S. at 761 (Breyer, J., concurring in part and concurring in the judgment) (explaining that universal jurisdiction requires, inter alia, "substantive uniformity among the laws of [the exercising] nations"). At bottom, then, the defendants' position is irreconcilable with the noncontroversial notion that Congress intended in § 1651 to define piracy as a universal jurisdiction crime. In these circumstances, we are constrained to agree with the district court that § 1651 incorporates a definition of piracy that changes with advancements in the law of nations.

We also agree with the district court that the definition of piracy under the law of nations, at the time of the defendants' attack on the USS Nicholas and continuing today, had for decades encompassed their violent conduct. That definition, spelled out in the UNCLOS, as well as the High Seas Convention before it, has only been reaffirmed in recent years as nations around the world have banded together to combat the escalating scourge of piracy. For example, in November 2011, the United Nations Security Council adopted Resolution 2020, recalling a series of prior resolutions approved between 2008 and 2011 "concerning the situation in Somalia"; expressing "grave[ ] concern[ ] [about] the ongoing threat that

piracy and armed robbery at sea against vessels pose"; and emphasizing "the need for a comprehensive response by the international community to repress piracy and armed robbery at sea and tackle its underlying causes." Of the utmost significance, Resolution 2020 reaffirmed "that international law, as reflected in the [UNCLOS], sets out the legal framework applicable to combating piracy and armed robbery at sea."[15] Because the district court correctly applied the UNCLOS definition of piracy as customary international law, we reject the defendants' challenge to their Count One piracy convictions, as well as their mandatory life sentences.

## III.

The defendants raise several additional appellate contentions, which we are also content to reject.

## A.

First, the defendants contend that the district court erroneously denied their individual motions to suppress statements they made on April 4, 2010, when questioned aboard the USS Nicholas three days after their capture. They assert that the interviews contravened the Fifth Amendment, because the investigators failed to adequately advise them of their right to counsel, and did not obtain knowing and intelligent waivers of their rights to counsel and to remain silent before soliciting their statements. Of course, under *Miranda v. Arizona*, a suspect in custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he

---

[15]Notably, as one of the permanent members of the Security Council, the United States supported the adoption of Resolution 2020, which was approved by a unanimous Security Council.

cannot afford an attorney one will be appointed for
him prior to any questioning if he so desires.

384 U.S. 436, 479 (1966). Once the proper warnings have
been given, the suspect "may knowingly and intelligently
waive [his] rights and agree to answer questions or make a
statement." *Id.*

1.

The district court conducted a pretrial evidentiary hearing
concerning the defendants' suppression motions on Septem-
ber 10-11, 2010, and denied the motions by its published
opinion of October 29, 2010. *See United States v. Hasan*, 747
F. Supp. 2d 642, 656 (E.D. Va. 2010) ("*Hasan III*").[16] Mate-
rial to the suppression issue, the court's *Hasan III* opinion
enumerated the following facts.

On April 4, 2010, Naval Criminal Investigative Service
("NCIS") Special Agent Michael Knox, accompanied by
NCIS Special Agent Theodore Mordecai and interpreter Aziz
Ismail, questioned the five defendants — Dire, Ali, Umar,
Gurewardher, and Hasan — aboard the USS Nicholas. *See
Hasan III*, 747 F. Supp. 2d at 666. Two days earlier, on April
2, Special Agent Knox had participated in onboard interviews
with three of the defendants, during which Ismail (then posted
with Special Agent Mordecai on another Navy vessel, the
USS Farragut) provided translation services via satellite tele-
phone. *See id.* at 659. Ismail, a naturalized United States citi-
zen, was born, reared, and educated in Somalia and "speaks
the same dialect of Somali that Defendants speak." *Id.* During
the April 2 interviews, "Hasan and Dire both represented that

---

[16]For the sake of clarity, we acknowledge that the opinion defined
herein as "*Hasan III*" was issued on the same day as the pretrial *Hasan I*
opinion denying the defendants' joint motion to dismiss the Count One
piracy charge. As such, *Hasan III* predates the *Hasan II* opinion withhold-
ing post-trial relief from the Count One convictions.

they were fishermen who had been kidnapped by the other Defendants and forced to engage in piracy," but "Gureward-her immediately confessed to being a pirate and engaging in piratical operations." *Id.* at 660. Ismail and Mordecai were thereafter taken by helicopter from the Farragut to the Nicholas to assist Knox in person with the April 4 questioning of all five defendants. *Id.* at 666.[17]

The defendants were brought on April 4, 2010, to the centerline passageway of the USS Nicholas, where they were interviewed first individually and then as a group. *See Hasan III*, 747 F. Supp. 2d at 666. Neither Special Agents Knox and Mordecai nor interpreter Ismail was "visibly armed," and other "armed personnel were several feet away, and only in the vicinity when the defendants came and went"; meanwhile, the defendants "were handcuffed but not blindfolded." *Id.* At the outset of each interview, "Knox, speaking through Ismail, recited from memory a number of warnings." *Id.* Knox was "an experienced NCIS agent who convincingly testified that he has given *Miranda* warnings approximately 500 times and can recite them from memory." *Id.* at 668.

According to Special Agent Knox, he advised each defendant "'that they have the right to remain silent; that at any time they could . . . request to be taken back to their holding area[;] and . . . that if they wanted a lawyer, we would give them one.'" *Hasan III*, 747 F. Supp. 2d at 666 (quoting J.A. 147). Knox had "intentionally modified his articulation of [the defendants'] right to attorneys because he 'knew getting a lawyer on the ship was impossible,'" *id.* (quoting J.A. 147); in any event, none of the defendants requested a lawyer. Fol-

---

[17]The district court suppressed Gurewardher's April 2 confession because, on that date, "Special Agent Knox failed to advise him adequately of his Fifth Amendment rights, as required by *Miranda*." *See Hasan III*, 747 F. Supp. 2d at 659-66. That ruling is not at issue in this appeal, which focuses on the adequacy of the *Miranda* warnings given to the defendants on April 4.

lowing the warnings, Knox read each defendant a "cleansing statement" that he had received earlier that day by email and also "'slightly modified to fit the situation.'" *Id.* (quoting J.A. 148). The "cleansing statement" advised, inter alia, "'that the interview with me today is a new interview'"; that "'[j]ust because you talked to me or someone else before does not mean you have to do so today'"; and that, "'[i]f you choose to talk to me today, anything you say can be used against you in court.'" *Id.* at 667 (quoting J.A. 149).

Other government witnesses, including Special Agent Mordecai and interpreter Ismail, "all corroborated the fact that Special Agent Knox administered warnings to Defendants, although their recollections of the warnings varied slightly." *Hasan III*, 747 F. Supp. 2d at 667. Ismail "recall[ed] translating both an explanation by Special Agent Knox that Defendants had the right not to say anything and the written 'cleansing statement' as read by Knox," but also "indicat[ed] that the warnings were not delivered as they are on television." *Id.* Additionally, "Ismail acknowledg[ed] that he may have translated warnings relating to the use of statements in court and the availability of an attorney for Defendants, but simply [did] not recall." *Id.* Ismail was more clear "that he asked each Defendant at the conclusion of [Knox's] warnings if that Defendant understood, and each Defendant . . . said 'yes' in Somali." *Id.* at 667-68. Other testimony indicated that the defendants instead nodded their heads, but no witness "perceived anything indicating that any of the Defendants had *not* understood the warnings," and "at no point did any of the Defendants show any sign of reluctance or confusion." *Id.* at 668. Although "Ali and Dire initially claimed [that they had] been forced to participate in the attack [on the USS Nicholas,] eventually, upon a few minutes of [individual] questioning, each Defendant admitted to being a pirate, and Hasan, Ali, and Dire each admitted to specific roles in the [Nicholas] attack" — information that was reconfirmed during the subsequent group interview. *Id.* (internal quotation marks omitted).

2.

Evaluating the evidence before it, the district court found "that Special Agent Knox did, in fact, administer the warnings he recalled to each of the Defendants at the beginning of each of their interviews on April 4, 2010." *Hasan III*, 747 F. Supp. 2d at 669. The court also determined that "no deficiency appears to exist in Special Agent Knox's modified warning with respect to Defendants' right to an attorney." *Id.* (relying on *United States v. Frankson*, 83 F.3d 79 (4th Cir. 1996), for the proposition that Knox's warning was adequate even though he "only advised Defendants that counsel would be provided to them if they wanted one, and therefore did not specify that Defendants had the right to the presence of an attorney prior to questioning").

The district court deemed it a closer question whether the defendants — being "non-English speaking and illiterate Somali nationals, without any connection to the United States" — could have "knowingly and intelligently waived their Fifth Amendment rights against self-incrimination." *See Hasan III*, 747 F. Supp. 2d at 669 (expressing sympathy to the defendants' portrait of "conditions in Somalia," including a "barely functional" government, a dearth of lawyers, and the absence of "individual freedoms protecting persons who wish to refuse to answer questions from authorities"). For guidance, the district court looked to *Berghuis v. Thompkins*, in which the Supreme Court recently clarified that "waivers can be established [by] formal or express statements of waiver," but also can be "implied from all the circumstances." *See* 130 S. Ct. 2250, 2261 (2010). Cognizant of the principle that no waiver — express or implied — can be established absent the prosecution's "showing that the accused understood [his] rights," *see id.*, the district court confronted the defendants' assertion that they did not understand Special Agent Knox's *Miranda* warnings. *See Hasan III*, 747 F. Supp. 2d at 670. The court rejected that assertion, explaining:

[T]he evidence before the Court indicates that Special Agent Knox did, in fact, ask each Defendant if he understood the rights that had just been given to him. Although the testimony diverges as to the precise nature of Defendants' response — Special Agents Knox and Mordecai recalled only nodding and/or the lack of any indication of not understanding, whereas [interpreter] Ismail recalls each Defendant verbally saying "Yes" in Somali — the testimony is uniform in suggesting understanding, as opposed to lack thereof, on the part of Defendants. Ultimately, Defendants were adequately warned of their rights against self-incrimination under the Fifth Amendment in accordance with the requirements of *Miranda*. The *Miranda* rights were recited to Defendants, through Ismail, . . . in their native language. At no point did Defendants claim that they did not understand the words being recited by Ismail, or that Ismail was not speaking their native language or dialect. Moreover, during the entire interview process, Defendants were awake, alert, drug-free, and engaged.

Of course, whether Defendants actually understood their Fifth Amendment rights against self-incrimination remains a somewhat close question. Defendants argue that their upbringing in a country that has become increasingly lawless in recent decades rendered them incapable of understanding the *Miranda* rights recited . . . .

Nevertheless, it appears . . . that the inquiry as to whether a defendant understood the recitation of the Fifth Amendment rights focuses not on the defendant's understanding of the U.S. criminal justice system, the democratic form of government, and/or the concept of individual rights, but rather on whether

the defendant could, merely as a linguistic matter, comprehend the words spoken to him.

Although Defendants have asserted through counsel that they are illiterate, there is no evidence showing them to be of below-average intelligence or to suffer from any mental disabilities. Accordingly, although Defendants may have a hard time understanding the notion of individual rights such as those guaranteed by the Fifth Amendment, that does not mean that they could not have or did not understand their options upon Special Agent Knox's recitation of the *Miranda* warnings and the "cleansing statement." Even assuming that Defendants may not have grasped the nature and processes of the United States judicial system — which would admittedly appear to be a rather fair assumption in this case, based on the limited record before the Court — they nevertheless must have understood, from the translated words uttered by Special Agent Knox alone, that they did not have to speak with him, and that they could request counsel. Needless to say, despite current conditions in Somalia, the concept of an attorney is not a foreign one there.

*Hasan III*, 747 F. Supp. 2d at 670-71 (citations omitted). Premised on that analysis, the court concluded that each of the defendants "knowingly and intelligently waived [his] Fifth Amendment rights against self-incrimination." *Id.* at 671-72.[18]

_____

[18]To constitute a valid waiver, the suspect's rights must be relinquished not only "knowingly and intelligently," but also "voluntarily." *See Miranda*, 384 U.S. at 444. The defendants alleged in the district court that their statements were coerced, in "that they were detained in uncomfortable and oppressive conditions, and that they were threatened with being thrown overboard into shark-infested waters if they did not admit guilt." *Hasan III*, 747 F. Supp. 2d at 672. The court disbelieved the defendants, however, instead crediting the government's evidence that the defendants

3.

On appeal, the defendants contend that the district court erred in finding that Special Agent Knox's warnings adequately advised them of their Fifth Amendment rights in accordance with *Miranda*. More specifically, they assert that the court could not determine the exact content of the warnings based on Knox's testimony. The defendants further posit that the warnings were constitutionally deficient because Knox did not convey to them that they had a "right" to a lawyer; rather he stated "that if they wanted a lawyer, we would give them one." J.A. 147. Even if the warnings comported with the *Miranda* requirements, however, the defendants insist that the district court was wrong in concluding that they could have knowingly and intelligently waived their rights.[19]

In assessing the district court's denial of the defendants' suppression motions, we review the court's factual findings for clear error and its legal determinations de novo. *See United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012). And we are obliged to view the evidence "in the light most favorable to the government," as the prevailing party below. *See United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (internal quotation marks omitted).

We perceive no clear error in the district court's findings

"were treated safely, humanely, and respectfully throughout the entire duration of their captivity on board the USS Nicholas, and were at no time, including during . . . the April 4, 2010 interviews, threatened or mistreated in any way." *Id.* The defendants now concede the voluntariness of their statements.

[19]Because the government has not argued otherwise, we assume without deciding that the Fifth Amendment rights implicated by *Miranda* "apply even 'to the custodial interrogation of a foreign national outside the United States by [U.S.] agents . . . engaged in a criminal investigation.'" *See Hasan III*, 747 F. Supp. 2d at 657 (alterations in original) (quoting *United States v. Rommy*, 506 F.3d 108, 131 (2d Cir. 2007)).

concerning the content of the *Miranda* warnings, in that the court reasonably accepted the testimony of Special Agent Knox. Although the court acknowledged that there were "slight variations in the recollections of the various witnesses," it deemed "the testimony offered by the Government to be substantially consistent and credible." *Hasan III*, 747 F. Supp. 2d at 668. As we have emphasized, "[w]hen findings are based on determinations regarding the credibility of witnesses, we give even greater deference to the trial court's findings." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (internal quotation marks omitted).

We are further satisfied that the district court committed no legal error in concluding that Special Agent Knox's warnings sufficiently advised the defendants of their right to counsel. Again, the court found that Knox advised the defendants "'that if they wanted a lawyer, we would give them one.'" *Hasan III*, 747 F. Supp. 2d at 666 (quoting J.A. 147). To be sure, there is, as the defendants point out, an obvious distinction between wanting a lawyer and having a right to a lawyer. But Knox did not ask the defendants simply: "Do you want a lawyer?" Rather, he declared "that if they wanted a lawyer, we would *give* them one." J.A. 147 (emphasis added). Knox's unqualified offer to give the defendants a lawyer upon their request conveyed to the defendants that they had an entitlement — a right — to a lawyer. *Cf. Frankson*, 83 F.3d at 82 ("Given the common sense understanding that an unqualified statement lacks qualifications, all that police officers need do is convey the general rights enumerated in *Miranda*.").

Put succinctly, Special Agent Knox was not obligated to actually verbalize the phrase "right to a lawyer" when his warning "effectively convey[ed] the same meaning." *See United States v. Sanchez*, 422 F.2d 1198, 1201 (2d Cir. 1970) (concluding that defendants were adequately advised of right to counsel with warnings that they "'need make no statements without the presence of an attorney'" and "'[if] you couldn't afford an attorney, an attorney will be provided for you'").

Indeed, no "precise formulation of the warnings" or "talismanic incantation [is] required to satisfy [*Miranda*'s] strictures." *California v. Prysock*, 453 U.S. 355, 359 (1981). The relevant "inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Florida v. Powell*, 130 S. Ct. 1195, 1204 (2010) (alterations and internal quotation marks omitted). We agree with the district court that Knox's warnings did just that.

The defendants persist that their statements should have been suppressed regardless of the adequacy of the *Miranda* warnings, because they could not have validly waived their Fifth Amendment rights against self-incrimination. That is, the defendants maintain that any waiver of their rights was not knowing and intelligent because of the language barrier, their unfamiliarity with the American legal system, the social and political conditions in their native Somalia, and their illiteracy and overall lack of education.

For a waiver to be knowing and intelligent, it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). As we have explained, "[t]he determination of whether a waiver was knowing and intelligent requires an examination of the totality of the circumstances surrounding the interrogation, including the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of the *Miranda* warnings." *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995) (alteration and internal quotation marks omitted).

The district court found that there was "no evidence showing [the defendants] to be of below-average intelligence or to suffer from any mental disabilities." *Hasan III*, 747 F. Supp. 2d at 671. Yet even "[i]n cases involving defendants with low intellectual ability, the knowingness of the waiver often turns on whether the defendant expressed an inability to understand

the rights as they were recited." *United States v. Robinson*, 404 F.3d 850, 861 (4th Cir. 2005) (concluding that defendant's "below average I.Q. does not make him per se incapable of intelligently waiving his rights"). Here, the court determined that "the testimony is uniform in suggesting [the defendants'] understanding" of their Fifth Amendment rights. *Hasan III*, 747 F. Supp. 2d at 670. That the defendants were non-English speakers "does not necessarily thwart an effective waiver" of those rights, *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997), particularly since the court ascertained that Special Agent Knox's warnings "were recited to [the defendants], through Ismail, the interpreter, in their native language." *Hasan III*, 747 F. Supp. 2d at 670.

We think the district court made a "fair assumption" that the defendants "may not have grasped the nature and processes of the United States judicial system." *Hasan III*, 747 F. Supp. 2d at 671. Nevertheless, there is no indication that the defendants did not understand "the concept of an attorney," which, as the district court found, "is not a foreign [concept in Somalia]." *Id.* Moreover, it is not necessary that "a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Rather, the "main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." *Berghuis*, 130 S. Ct. at 2261. Based on the totality of the circumstances, we discern no error in the court's conclusion that the defendants "must have understood, from the translated words uttered by Special Agent Knox alone, that they did not have to speak with him, and that they could request counsel." *Hasan III*, 747 F. Supp. 2d at 671. We therefore affirm the court's denial of the defendants' suppression motions.[20]

---

[20]Because the district court properly denied the suppression motions, we need not reach the defendants' appellate contention that their convictions of the RPG-related offenses (Counts Twelve through Fourteen) cannot stand absent their April 4, 2010 statements. *See* Br. of Appellants 63-67.

## B.

Next, defendant Hasan maintains that the district court erred in denying his motion to dismiss the Indictment's charges against him pursuant to the Juvenile Delinquency Act, 18 U.S.C. §§ 5031-5042 (the "JDA"), on the ground that the government failed to establish that he was at least eighteen years of age at the time of his alleged offenses.[21] The court rejected Hasan's JDA contention by the pretrial *Hasan III* opinion of October 29, 2010. *See* 747 F. Supp. 2d at 672-73.

In doing so, the district court placed on the government "'the initial burden of proving [Hasan's] age,'" thereby requiring the government to "'offer prima facie evidence of [his] adult status.'" *See Hasan III*, 747 F. Supp. 2d at 673 (quoting *United States v. Juvenile Male*, 595 F.3d 885, 897 (9th Cir. 2010)). The court recognized that "'a previous statement from [Hasan] that he is an adult can constitute such prima facie evidence,'" and that, "[i]f the Government adequately presents such prima facie evidence, '[t]he burden then shifts to the defense to come forward with evidence of [Hasan's] juvenile status.'" *Id.* (second alteration in original) (quoting *Juvenile Male*, 595 F.3d at 897). In that circumstance, the government would then have "'an opportunity to rebut [such evidence] with any additional information' available." *Id.* (alteration in original) (quoting *Juvenile Male*, 595 F.3d at 897).

---

[21]As we have explained, "[t]he primary purpose of the JDA is 'to remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation.'" *United States v. Blake*, 571 F.3d 331, 344 (4th Cir. 2009) (quoting *United States v. Juvenile Male*, 554 F.3d 456, 460 (4th Cir. 2009)). The JDA "defines a 'juvenile' as a person who has not attained his eighteenth birthday or who committed an alleged offense prior to his eighteenth birthday, and who has not attained his twenty-first birthday prior to the filing of the [federal criminal charge]." *Juvenile Male*, 554 F.3d at 459 n.2 (citing 18 U.S.C. § 5031).

Resolving conflicting testimony, the district court found that Hasan told "Special Agents Knox and Mordecai during the April 4, 2010 interview that he was (or believed himself to be) between 24 and 26 years old." *Hasan III*, 747 F. Supp. 2d at 676. Accordingly, the court concluded that the government satisfied its burden of making a prima facie showing of Hasan's adult status, and shifted the burden "to Hasan to produce credible evidence that he [was], in fact, a minor, notwithstanding his statements to the contrary." *Id.* Explaining why "Hasan's testimony at the evidentiary hearing simply did not meet that burden," the court observed:

> The credibility of [Hasan's] testimony [that he did not know the day or year of his birth but had been told by unnamed neighbors that he was eighteen years old] was questionable, and he testified that he could produce no corroborating documentary evidence or testimony from others. Although Hasan's lack of knowledge about his own birth date or birth year is rendered less surprising and/or suspect by the testimony of [interpreter] Ismail [that most Somalis do not know their exact birth date, but generally know their birth year], Hasan's testimony nevertheless contradicted itself as much as it did the testimony of Special Agents Knox and Mordecai.

*Id.* at 676-77 (footnote omitted). In the end, the court found — "[b]ased on [its] observation of Hasan during his testimony, as well as on the content of that testimony" — that Hasan's "self-serving testimony that he is currently only 18 years old" was not credible and deserved little weight. *Id.* at 677.

Without contesting the district court's use of the burden-shifting scheme to establish his age, Hasan asserts on appeal that the court erroneously accepted the "contradictory and vague testimony" of Special Agents Knox and Mordecai in satisfaction of the government's prima facie showing. *See* Br.

of Appellants 50. We disagree. The court reasonably observed that, "[a]lthough the agents' notes and testimony varied slightly from each other, the variance was effectively explained" and "nowhere in their notes or testimony is there any suggestion whatsoever that Hasan told them he was under the age of 18." *Hasan III*, 747 F. Supp. 2d at 676. Moreover, the court found Knox and Mordecai "to be credible witnesses, and their testimony to be credible and substantially consistent in all material respects." *Id.* Given the "highly deferential standard of review, we are not in a position to disturb the court's credibility finding." *See United States v. Nicholson*, 611 F.3d 191, 208 (4th Cir. 2010). Because Hasan does not challenge the court's ruling that his testimony failed to rebut the government's prima facie evidence of his adult status, the conclusion that the protections of the JDA did not apply and the denial of Hasan's motion to dismiss must be affirmed.

## C.

Lastly, the defendants fault the district court for declining to merge, for sentencing purposes, their three convictions under 18 U.S.C. § 924(c) — Counts Ten through Twelve — into a single § 924(c) offense. The defendants were convicted for their use of the two AK-47s in Counts Ten and Eleven under 18 U.S.C. § 924(c)(1)(A)(iii), which provides in pertinent part that "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm . . . shall . . . if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years." Count Twelve was aimed at the defendants' use of the RPG and charged under § 924(c)(1)(A) and (c)(1)(B)(ii), mandating a sentence of "not less than 30 years" for use of a destructive device in relation to a crime of violence.

Significantly, the district court considered Count Twelve to be the first conviction under § 924(c), and Counts Ten and Eleven to be second or subsequent § 924(c) convictions, thus

subjecting the defendants to minimum twenty-five-year sentences on Counts Ten and Eleven under § 924(c)(1)(C)(i) ("In the case of a second or subsequent conviction under this subsection, the person shall[ ] be sentenced to a term of imprisonment of not less than 25 years . . . ."). And, following the directive of § 924(c)(1)(D)(ii), the court ordered consecutive sentences for the § 924(c) convictions — twenty-five years (300 months) each on Counts Ten and Eleven, plus thirty years (360 months) on Count Twelve.

Notwithstanding the defendants' contentions to the contrary, we conclude that the district court imposed proper sentences. Our precedent dictates the conclusion "that multiple, consecutive sentences under § 924(c)(1) are appropriate whenever there have been multiple, separate acts of firearm use or carriage, *even when all of those acts relate to a single predicate offense*." *United States v. Lighty*, 616 F.3d 321, 371 (4th Cir. 2010) (emphasis added) (citing *United States v. Camps*, 32 F.3d 102, 106-09 (4th Cir. 1994)). Moreover, as the district court observed in its post-trial *Hasan II* opinion, the attack on the USS Nicholas actually involved "eight distinct counts in the Superseding Indictment charging 'crimes of violence.'" *Hasan II*, slip op. at 16. That the defendants used their weapons contemporaneously during the same attack does not diminish the number of predicate offenses. *See United States v. Higgs*, 353 F.3d 281, 333-34 (4th Cir. 2003) (affirming three consecutive § 924(c) sentences where uses related to a near-simultaneous triple murder (citing *Deal v. United States*, 508 U.S. 129, 132 (1993)). Thus, the separate "uses" of the firearms need not be tallied because there were multiple predicate crimes of violence. *See United States v. Khan*, 461 F.3d 477, 493 n.9 (4th Cir. 2006) (concluding that court was not required to count the "uses" of firearms where defendant's "four crime-of-violence convictions constitute separate predicate offenses, [such that] each may support a consecutive § 924(c) sentence").

## IV.

Pursuant to the foregoing, we affirm the convictions and sentences of each of the defendants.

*AFFIRMED*