**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-4413**

UNITED STATES OF AMERICA,

Plaintiff – Appellant,

v.

MOHAMED ALI SAID, a/k/a Mohammed Said, a/k/a Maxamad Cali
Saciid; MOHAMED ABDI JAMA, a/k/a Mohammed Abdi Jamah;
ABDICASIIS CABAASE; ABDI RAZAQ ABSHIR OSMAN, a/k/a
Abdirasaq Abshir; MOHAMED FARAH, a/k/a Mahamed Farraah
Hassan,

Defendants – Appellees.

**No. 14-4420**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MOHAMED ABDI JAMA, a/k/a Mohammed Abdi Jamah,

Defendant – Appellant.

**No. 14-4421**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MOHAMED FARAH, a/k/a Mahamed Farraah Hassan,

Defendant – Appellant.

**No. 14-4423**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ABDI RAZAQ ABSHIR OSMAN, a/k/a Abdirasaq Abshir,

Defendant – Appellant.

**No. 14-4424**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MOHAMED ALI SAID, a/k/a Mohammed Said, a/k/a Maxamad Cali Saciid,

Defendant – Appellant.

**No. 14-4429**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

2

ABDICASIIS CABAASE,

                        Defendant – Appellant.

_____

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. Raymond A. Jackson, District Judge. (2:10-cr-00057-RAJ-DEM-1; 2:10-cr-00057-RAJ-DEM-2; 2:10-cr-00057-RAJ-DEM-4; 2:10-cr-00057-RAJ-DEM-5; 2:10-cr-00057-RAJ-DEM-6)

_____

Argued: May 13, 2015                    Decided: August 13, 2015

_____

Before KING and KEENAN, Circuit Judges, and DAVIS, Senior Circuit Judge.

_____

No. 14-4413 reversed in part, vacated in part, and remanded; Nos. 14-4420, 14-4421, 14-4423, 14-4424, and 14-4429 affirmed by published opinion. Judge King wrote the opinion, in which Judge Keenan and Senior Judge Davis joined. Senior Judge Davis wrote a separate concurring opinion.

_____

**ARGUED:** Benjamin L. Hatch, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellant/Cross-Appellee. Geremy C. Kamens, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellees/Cross-Appellants. **ON BRIEF:** Dana J. Boente, United States Attorney, Alexandria, Virginia, Joseph E. DePadilla, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia; Jerome J. Teresinski, Trial Attorney, National Security Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant/Cross-Appellee. Michael S. Nachmanoff, Federal Public Defender, Frances H. Pratt, Keith Loren Kimball, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellee/Cross-Appellant Mohamed Ali Said; Robert B. Rigney, PROTOGYROU & RIGNEY, PLC, Norfolk, Virginia, for Appellee/Cross-Appellant Mohamed Abdi Jama; David M. Good, DAVID MICHAEL GOOD, PC, Virginia Beach, Virginia, for Appellee/Cross-Appellant Mohamed Farah; Trey R. Kelleter, VANDEVENTER BLACK LLP, Norfolk, Virginia, for Appellee/Cross-Appellant Abdi Razaq Abshir Osman; Bruce C. Sams, SAMS & GILCHRIST PLLC, Norfolk, Virginia, for Appellee/Cross-Appellant Abdicasiis Cabaase.

KING, Circuit Judge:

In early 2010, a group of seven Somalis — including defendants Mohamed Ali Said, Mohamed Abdi Jama, and Abdicasiis Cabaase — boarded a small skiff and entered the Gulf of Aden (in the Indian Ocean between the Arabian Peninsula and the Horn of Africa), intending to seize a merchant ship at sea. Their objective was foiled by the British warship HMS Chatham, which was conducting a counter-piracy mission in the Gulf. Undeterred by their initial lack of success, Said, Jama, and Cabaase joined with defendants Abdi Razaq Abshir Osman and Mohamed Farah, plus two others, and returned from Somalia to the Gulf in the skiff in April 2010. During their April escapade, the defendants and their accomplices launched an attack on the USS Ashland, a United States Navy warship that they confused for a merchant vessel. The Ashland responded by destroying the skiff and killing one of the attackers.

After the defendants were apprehended and transported to the Eastern District of Virginia, they were tried and convicted of multiple offenses, including piracy as proscribed by 18 U.S.C. § 1651. At sentencing, the district court declined to impose statutorily mandated life sentences on the defendants, reasoning that such sentences would contravene the Eighth Amendment's prohibition against cruel and unusual punishment.

4

See <u>United States v. Said</u>, No. 2:10-cr-00057 (E.D. Va. Feb. 28, 2014), ECF No. 260 (the "Eighth Amendment Order").[1]

The government, in pursuing its appeal in No. 14-4413, seeks relief from the district court's decision not to impose the life sentences required by § 1651. By their cross-appeals in Nos. 14-4420, 14-4421, 14-4423, 14-4424, and 14-4429, the defendants challenge the court's failure to dismiss the § 1651 charge, the jury instructions with respect to the piracy offense, and the sufficiency of the evidence supporting certain of their convictions. As explained below, we reject each of the defendants' contentions and affirm their convictions. We deem the government's appeal to be meritorious, however, and reverse the Eighth Amendment Order, vacate the defendants' sentences, and remand for resentencing.

I.

A.

1.

In approximately February 2010, defendants Said, Jama, and Cabaase — along with Jama Idle Ibrahim and three others —

---

[1] The Eighth Amendment Order is published at 3 F. Supp. 3d 515 and also found at J.A. 886-902. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in these appeals.)

acquired a small wooden skiff on the coast of Somalia and loaded it with a hooked ladder and weapons, including AK-47 assault rifles, a rocket-propelled grenade launcher (an "RPG"), a Singapore Assault Rifle 80 (an "SAR-80"), and a Tokarev 9-mm pistol.[2] They also equipped the skiff with two motors, enabling it to more swiftly traverse the sea. The group then left Somalia and travelled into the Gulf of Aden searching for a merchant ship to seize. The Gulf is one of the most heavily trafficked shipping corridors in the world, making it a prime location for piracy.

On the afternoon of February 27, 2010, the skiff was intercepted in the Gulf of Aden by the HMS Chatham of the British Royal Navy. Upon encountering the skiff, the Chatham actioned a helicopter for a close investigation. The Somalis, recognizing the Chatham as a warship, attempted to flee in the skiff and threw weapons and their ladder overboard. Those actions were witnessed by the helicopter pilots, who conveyed information to a boarding team that had been dispatched in smaller boats from the warship.

The HMS Chatham's boarding team seized and searched the skiff, where team members discovered the pistol and ammunition

_____

[2] We recite the facts in the light most favorable to the government, as the prevailing party at trial. See United States v. Singh, 518 F.3d 236, 241 n.2 (4th Cir. 2008).

6

for that weapon and the AK-47s. The boarding team also apprehended and questioned the Somalis. Ibrahim, speaking as the group's leader, asserted that the Somalis were smugglers who had taken human cargo to Yemen and that one of their boats had broken down along the way.[3] Personnel of the Chatham photographed the Somalis, confiscated the pistol and ammunition, disabled one of the skiff's motors, spray-painted a red identification number on the skiff, and ordered the Somalis to return home.

2.

In April 2010, the five defendants in this case, along with Ibrahim and another man called the "Engineer," used the same skiff to enter the Gulf of Aden from Somalia. So that the skiff "would not be recognizable," the Somalis had obliterated the identification number spray-painted on it by Royal Navy personnel. See J.A. 415. To accomplish their goal of seizing a ship, the Somalis had obtained a replacement for the disabled motor and loaded the skiff with a hooked ladder, three AK-47s, and an RPG. Ibrahim and Jama led the new mission, and Said was

---

[3] Ibrahim later explained that the Somalis' cover story had to involve two boats to seem plausible, given that seven men claiming to be smugglers were aboard the skiff. Those who patrol the high seas and "see people smuggling people almost every day" would know that only two or three smugglers — and "not more than that" — generally carry out such missions. See J.A. 389.

7

next in command.  Farah drove the skiff, and Cabaase and Osman supplied two of the weapons.

In the pre-dawn hours of April 10, 2010, the skiff swiftly approached a large ship believed by the Somalis to be a "cargo ship."  See J.A. 444.  Nearing the ship's aft on its port side, Said and Cabaase held loaded AK-47s, while Jama attempted to load the RPG with explosive rockets.[4]  When the skiff was approximately twenty-five yards from the "cargo ship," Cabaase began shooting at it with his AK-47.  The Somalis intended to "scare [the crew], and then after that[,] capture the ship." Id.  The encounter took place about forty nautical miles off the coast of Yemen in international waters.

The targeted ship was actually the USS Ashland, a dock landing ship of the United States Navy, which was then transiting the Gulf of Aden transporting Marines and military equipment.[5]  Several personnel aboard the Ashland — namely, Marine Lance Corporal John Curtis, Damage Control Fireman James

---

[4] Unable to render the RPG operational, Jama sought the assistance of Ibrahim, who soon realized that the ammunition on board the skiff did not fit the RPG.

[5] As one of the Ashland's personnel later testified, the vessel "is one of the ships in the U.S. Navy inventory that actually looks like a merchant ship."  See J.A. 203-04.  With military equipment on board, the Ashland "could be misconstrued as . . . a merchant container vessel that isn't fully loaded." Id. at 204.

Hendershot, Seaman Donald Lane, Lieutenant Junior Grade Benjamin Towers, Lieutenant Brent Holloway, and Gunner's Mate Justin Myers — witnessed the Somalis' attack from several vantage points, including near the warship's aft, its mid-ship, and the bridge. Several of the witnesses saw Cabaase fire multiple rounds at the Ashland and heard bullets striking the ship. See, e.g., J.A. 153 (Curtis: "He was deliberately shooting . . . the weapon towards the front right over the bridge of the USS ASHLAND."); id. at 186 (Hendershot: "I saw a man stand up and bring a weapon up to his shoulder aiming at the ship . . . ."); id. at 282 (Myers: "You saw a muzzle flash followed by the sound of a weapon, and I also heard a couple of clangs that sounded like ricochet on the side of the boat."). Indeed, Corporal Curtis witnessed Cabaase "load a magazine, rack it, fire like two to three times, bang, bang, bang. Bang, bang. He dropped the magazine, loads another one, racks it a couple of times, keeps shooting, bang, bang, bang." Id. at 153-54. The multiple shots fired at the Ashland were so startling that the warship's helmsman had difficulty with the steering.

Gunner's Mate Myers initially left his remote firing station inside the USS Ashland to observe the skiff's assault from the warship's deck. After watching Cabaase fire multiple times at the Ashland, Myers ran back to his duty station, where he controlled 25-mm machine guns loaded with armor-piercing

incendiary shells.  The screen of the weapons system operated by Myers displayed images from an infrared camera mounted outside the ship.  The camera zoomed in so closely on the skiff that it seemed "[a]lmost as if you [were] standing next to some of the people in the skiff."  See J.A. 213.  Myers's vantage point enabled him to see that Cabaase was aiming directly at the Ashland.  After Cabaase began firing a second series of shots, the Ashland's Captain ordered Myers to return fire with a 25-mm machine gun, and Myers promptly fired two shots.  As a result of those shots from the Ashland, a fire erupted on the skiff, the Engineer died, and Farah lost a leg.[6]

The defendants jumped off the burning skiff, and Ibrahim followed suit after throwing the RPG and two of the AK-47s overboard.  While treading water, the Somalis agreed to tell the crew of the USS Ashland a story similar to the one that had been concocted for the personnel of the HMS Chatham — that the skiff was returning from smuggling refugees to Yemen.  To explain why they were travelling on one small skiff, they would tell the Ashland's crew about transporting refugees on a second larger boat that had broken down before their return trip.  The Somalis also agreed to explain that they were stranded without food or

---

[6] The defendants each suffered burns as a result of trying to put out the fire on the skiff, but Ibrahim was not injured.

10

fuel, and that the Engineer (who was then deceased) had fired on the Ashland to alert the crew that they were in need of rescue.

The USS Ashland and its personnel apprehended the defendants and Ibrahim, took pictures of the skiff's remains, and seized its contents, including the weapons and the hooked ladder that were left aboard. The Somalis were subsequently transported to Virginia, where this prosecution was initiated.

B.

1.

On April 21, 2010, the grand jury in the Eastern District of Virginia at Norfolk returned an indictment against the defendants and Ibrahim. Nearly three months later, on July 7, 2010, the grand jury returned a superseding indictment. Those indictments — which dealt solely with the attack on the USS Ashland — charged the defendants and Ibrahim with, inter alia, piracy in contravention of 18 U.S.C. § 1651. That statute provides in full:

> Whoever, on the high seas, commits the crime of piracy as defined by the law of nations, and is afterwards brought into or found in the United States, shall be imprisoned for life.

18 U.S.C. § 1651.

On June 9, 2010, the defendants and Ibrahim moved to dismiss the piracy charge of the initial indictment, contending that piracy under § 1651 requires a robbery at sea. Because

11

their effort to seize the Ashland was unsuccessful, the defendants and Ibrahim argued that the § 1651 piracy charge should be dismissed. The district court agreed with the defendants and granted their motion on August 17, 2010, dismissing the piracy charge from the superseding indictment.

On August 21, 2010, Ibrahim entered into a plea agreement with the United States Attorney, by which he agreed to assist the government in its prosecution of his cohorts. On August 27, 2010, Ibrahim pleaded guilty to three counts of the superseding indictment: attack to plunder a vessel, in contravention of 18 U.S.C. § 1659; performing an act of violence against an individual on a vessel, in contravention of 18 U.S.C. § 2291(a)(6); and using, carrying, and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). On November 29, 2010, Ibrahim was sentenced to 360 months in prison.

2.

After Ibrahim was sentenced, the government filed an appeal contesting — as to the five defendants — the district court's dismissal of the § 1651 piracy charge. Following an oral argument conducted in this Court on March 25, 2011, we placed the government's appeal in abeyance pending argument and decision in United States v. Dire. The Dire appeals were brought by a separate group of Somalis who had been convicted of

12

piracy for their attack on the USS Nicholas, another Navy warship. The Dire defendants had intended to seize the Nicholas in the Indian Ocean, but their plan was foiled by the Nicholas's crew.

Like the defendants here, the Dire defendants argued that § 1651 requires a robbery — i.e., seizing or otherwise robbing a vessel. That contention is premised primarily on the Supreme Court's decision in United States v. Smith, 18 U.S. (5 Wheat.) 153, 162 (1820), where the Court indicated that it had "no hesitation in declaring, that piracy, by the law of nations, is robbery upon the sea." As the argument goes, because "a court must interpret a statute by its ordinary meaning at the time of its enactment," and because the language of § 1651 can be traced to an 1819 act of Congress, the Smith decision of 1820 constitutes "the definitive authority on the meaning of piracy." See United States v. Dire, 680 F.3d 446, 452 (4th Cir. 2012) (internal quotation marks omitted).

By our Dire decision, however, we rejected the theory that the meaning of piracy for purposes of § 1651 "was fixed in the early Nineteenth Century." See 680 F.3d at 467. That is, we excluded a static interpretation of § 1651 that would "render it incongruous with the modern law of nations and prevent us from exercising universal jurisdiction in piracy cases." Id. at 468-69. Rather, consistent with Congress's intent "to define piracy

13

as a universal jurisdiction crime," we concluded that "§ 1651 incorporates a definition of piracy that changes with advancements in the law of nations." Id. at 469. We recognized in Dire that, for decades, piracy has been defined by the law of nations to include:

>   (A)   (1) any illegal act of violence or detention, or any act of depredation; (2) committed for private ends; (3) on the high seas or a place outside the jurisdiction of any state; (4) by the crew or the passengers of a private ship; (5) and directed against another ship, or against persons or property on board such ship; or
>
>   (B)   (1) any act of voluntary participation in the operation of a ship; (2) with knowledge of the facts making it a pirate ship; or
>
>   (C)   (1) any act of inciting or of intentionally facilitating (2) an act described in subparagraph (A) or (B).

Id. at 465 (alterations and internal quotation marks omitted) (drawing definition from the substantively identical Geneva Convention on the High Seas (the "High Seas Convention") and United Nations Convention on the Law of the Sea (the "UNCLOS")).

Because the foregoing definition of piracy encompassed the Dire defendants' conduct, we affirmed their convictions under § 1651. The very day we decided Dire — that is, May 23, 2012 — we vacated the district court's dismissal of the § 1651 piracy charge in this case and "remand[ed] for such other and further proceedings as may be appropriate, consistent with our decision

14

in Dire." See United States v. Said, 680 F.3d 374, 375 (4th Cir. 2012).[7]

3.

On August 8, 2012, after our remand to the district court, the grand jury returned a second superseding indictment against the defendants (the "operative indictment"), lodging additional charges stemming from the February 2010 encounter with the British warship HMS Chatham. As a result of Ibrahim's cooperation, the government investigators and the grand jury had obtained evidence supporting those additional counts. The operative indictment contained the following charges:

- Count One — Conspiracy to commit hostage taking (18 U.S.C. § 1203(a));

- Count Two — Conspiracy to commit kidnapping (18 U.S.C. § 1201(c));

- Count Three — Conspiracy to perform an act of violence against an individual on a vessel (18 U.S.C. § 2291(a)(9));

- Count Four — Conspiracy to use and carry a firearm and a destructive device during and in relation to, and possessing a firearm and a destructive device in furtherance of, a crime of violence, specifically the crimes charged in Counts One through Three and Five through Eight (18 U.S.C. § 924(o));

_____

[7] The Dire defendants and the defendants in this case filed petitions for writs of certiorari in the Supreme Court, seeking to have the Court reverse our ruling in Dire concerning the ambit of § 1651. Those petitions were denied on January 22, 2013. See 133 S. Ct. 982 (2013).

- Count Five — Piracy as defined by the law of nations (18 U.S.C. § 1651);

- Count Six — Attack to plunder a vessel (18 U.S.C. § 1659);

- Count Seven — Assault with a dangerous weapon on a federal officer or employee (18 U.S.C. § 111(a)(1) and (b));

- Count Eight — Performing an act of violence against an individual on a vessel (18 U.S.C. § 2291(a)(6));

- Count Nine — Using and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, a crime of violence, specifically the crimes charged in Counts One through Three (18 U.S.C. § 924(c)(1)(A)); and

- Count Ten — Using, carrying, and discharging a firearm during and in relation to a crime of violence, specifically the crimes charged in Counts One through Three and Five through Eight (18 U.S.C. § 924(c)(1)(A)(iii)).

Counts One through Four of the operative indictment encompass the time period in which the encounters with the HMS Chatham and the USS Ashland occurred. Counts Five through Eight, plus Ten, deal solely with the attack on the Ashland, and Count Nine relates only to the Chatham. Counts Five through Ten include allegations of aiding and abetting, pursuant to 18 U.S.C. § 2(a).

Defendants Said, Jama, and Cabaase were named in all ten counts of the operative indictment. Defendants Osman and Farah were named in all counts except Count Nine. Prior to trial, the

defendants again moved to dismiss the § 1651 piracy charge (Count Five of the operative indictment), which the district court denied on the basis of the Dire decision.

4.

The defendants' trial began in Norfolk on February 19, 2013, and concluded on February 27, 2013. The trial featured extensive testimony from personnel aboard the USS Ashland and the HMS Chatham during their encounters in 2010 with the defendants. Ibrahim was called to the stand by the government, and the prosecutors used his testimony to establish several details underlying their case.

Ibrahim began by explaining how he became involved in piracy activities. For example, after seeing "a lot of people in [his] neighborhood making a lot of money [and] buying houses and nice cars" from acts of piracy, he decided to "jump on that, too." J.A. 360. Thus, in November 2008, Ibrahim joined a group of Somali pirates — none of whom are involved in this case — on a mission to seize merchant ships near the coast of Yemen. That group forcibly seized a Danish ship called the CEC Future, using assault weapons and a ladder. The pirates removed the Future to Somalia and held it "until [they] got a ransom" in January 2009. Id. at 363. Ibrahim was paid $17,000 for that piracy mission.

In early 2010, Ibrahim sought out another piracy mission in order to "get more money." J.A. 365. In February 2010, he

17

joined Said, Jama, Cabaase, and three others on the mission to "seize a ship" that was thwarted by the HMS Chatham. Id. at 383. Thereafter, in April 2010, Ibrahim and the defendants set out with another plan to "seize a ship" and "make money." Id. at 403. Ibrahim described his and the defendants' subsequent attack on the USS Ashland and their apprehension by its personnel. After being indicted for the Ashland attack, Ibrahim explained, he decided to plead guilty and cooperate with the federal prosecutors, seeking a less severe sentence.[8]

At the close of the prosecution's case, on February 25, 2013, the defendants moved for judgments of acquittal. The trial court denied the motions. The defendants rested without calling witnesses. The defendants objected to the court's proposed instructions on piracy under § 1651, which adopted the legal principles recognized and applied in Dire. The court overruled the defendants' objections and instructed the jury in a manner consistent with Dire. At the conclusion of the six-day trial, on February 27, 2013, the jury convicted the defendants on all counts. The defendants jointly filed a renewed motion

---

[8] After entering his guilty pleas in this case, Ibrahim pleaded guilty in the District of Columbia to charges relating to the 2008 seizure of the CEC Future. He was subsequently sentenced in that prosecution to twenty-five years in prison, to run concurrently with his sentence here.

18

for judgments of acquittal on May 13, 2013, which the court denied on August 1, 2013.

5.

On October 4, 2013, prior to their sentencing hearings, the defendants filed a motion to invalidate § 1651's mandatory life sentence on Eighth Amendment grounds. By its Eighth Amendment Order of February 28, 2014, the district court granted the motion.

The Eighth Amendment Order concluded that life sentences in the circumstances of this prosecution would contravene the defendants' Eighth Amendment rights. The district court began its analysis by recognizing the Supreme Court's two-prong framework for assessing as-applied Eighth Amendment challenges to non-capital sentences, as spelled out in Graham v. Florida, 560 U.S. 48 (2010). The district court explained that, under prong one, a court must "compare the gravity of the offense and the severity of the sentence," and determine "if that comparison yields 'an inference of gross disproportionality,' which should be a 'rare' result." See Eighth Amendment Order 6 (quoting Graham, 560 U.S. at 60). Upon ascertaining an inference of gross disproportionality, the court moves to prong two, which requires it to "compare the sentence with sentences received with other offenders in the same jurisdiction and with sentences imposed for the same crime in other jurisdictions." Id. "If

19

that analysis confirms that the sentence is grossly disproportionate," the district court explained, "then to impose the sentence would violate the Eighth Amendment." Id.

At prong one of the Eighth Amendment analysis, the district court assessed whether an inference of gross disproportionality arose upon comparing the proposed life sentences with the gravity of the defendants' § 1651 piracy offenses. The court reasoned that, although piracy is generally a serious offense, "this was not a run-of-the-mill case of modern piracy." See Eighth Amendment Order 11. Indeed, the court explained that the defendants' offenses were more properly characterized as attempted piracy, in that "[n]o victims were caused any physical harm, and it is unclear whether there was even any property damage." Id. The court concluded that the defendants had satisfied prong one of the Eighth Amendment analysis by establishing the inference that life sentences would be grossly disproportionate to their piracy offenses. Id. at 12.

The district court then turned to prong two of the Eighth Amendment analysis, comparing the proposed life sentences with sentences imposed on other offenders in the same jurisdiction and with sentences imposed for piracy in other jurisdictions. The court observed that, with the exception of statutes punishing recidivist offenders, almost all of the "federal criminal statutes carrying a mandatory minimum life sentence

20

. . . involve the death of another person." See Eighth Amendment Order 13. The court also perceived that imposing "a life sentence for the conduct in this case [would be] unique internationally," on the premise that the "global average sentence for piracy is just over 14 years." Id. at 16. Accordingly, the court concluded that the "statutorily-mandated sentence violates the Eighth Amendment and cannot be imposed." Id.

By its Eighth Amendment Order, the district court directed the parties to submit supplemental briefing on the appropriate sentences for the defendants' piracy convictions, in view of the court's invalidation of the mandatory life sentence. In his supplemental brief, the United States Attorney urged the court to impose a life sentence on each of the defendants, asserting that such sentences were legally mandated. The defendants, by contrast, made recommendations of various non-life sentences.

The defendants' sentencing hearings were conducted on May 14 and 15, 2014. Said was sentenced to an aggregate of 500 months (140 months for his § 1651 piracy offense), Jama to 500 months (140 months for piracy), Cabaase to 510 months (150 months for piracy), Osman to 360 months (240 months for piracy), and Farah to 384 months (264 months for piracy). The government and the defendants timely noted their respective appeals, and we

21

possess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b).

## II.

Although the defendants are cross-appellants in these proceedings, we will review their contentions in the first instance, as our dispositions of their appeals could render moot the government's challenge to the defendants' non-life sentences for their 18 U.S.C. § 1651 piracy offenses. By their appeals, the defendants contend that the district court erred in denying their motion to dismiss the piracy charge and in instructing the jury on the elements of piracy under § 1651. The defendants also maintain that the court erroneously denied their motions for judgments of acquittal, arguing that the evidence was insufficient to prove piracy and certain other offenses.

## A.

In contending that the district court erred with respect to the § 1651 piracy offense by declining to dismiss that charge and by erroneously instructing the jury, the defendants contest the court's reliance on United States v. Dire, 680 F.3d 446 (4th Cir. 2012). We review de novo a district court's denial of a motion to dismiss an indictment where the denial depends solely on questions of law. See United States v. Hatcher, 560 F.3d 222, 224 (4th Cir. 2009). We also review de novo the claim that

22

a jury instruction failed to correctly state the applicable law. See United States v. Jefferson, 674 F.3d 332, 351 (4th Cir. 2012).

The defendants again advance the contention — considered and rejected in Dire — that the definition of piracy under § 1651 is limited to robbery at sea. Nevertheless, the defendants concede that we are obliged to adhere to Dire, as one panel of this Court is not entitled to overrule another panel. See McMellon v. United States, 387 F.3d 329, 333-34 (4th Cir. 2004) (en banc). Furthermore, the defendants do not dispute that the district court faithfully applied the Dire principles. We thus have no trouble concluding that the court did not err in declining to dismiss the piracy charge or in instructing the jury on the elements of the § 1651 offense.[9]

## B.

Turning to the evidentiary issues, each defendant challenges the sufficiency of the evidence as to the § 1651 piracy offense. Additionally, the defendants, except for Said, challenge the sufficiency of the evidence on the offenses

---

[9] Notably, we are not alone in our interpretation of § 1651. Other courts, including two courts of appeals, have adopted the definition of piracy announced in Dire. See United States v. Ali, 718 F.3d 929, 936-37 (D.C. Cir. 2013); Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y, 725 F.3d 940, 943 (9th Cir. 2013).

23

charged in Count One (conspiracy to commit hostage taking), Count Two (conspiracy to commit kidnapping), and Count Three (conspiracy to perform an act of violence against an individual on a vessel). Because Counts One through Three served as the predicate offenses for Count Nine (using and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, a crime of violence), defendants Jama and Cabaase also seek vacatur of their Count Nine convictions.[10]

We review de novo a trial court's denial of a motion for judgment of acquittal. See United States v. Reed, 780 F.3d 260, 269 (4th Cir. 2015). In reviewing evidence sufficiency contentions, we are obliged to "view the evidence in the light most favorable to the government and sustain the jury's verdict if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." United States v. Barefoot, 754 F.3d 226, 233 (4th Cir. 2014) (emphasis and internal quotation marks omitted). A defendant

---

[10] None of the defendants challenge their convictions of the offenses charged in Count Four (conspiracy to use and carry a firearm and a destructive device during and in relation to, and possessing a firearm and a destructive device in furtherance of, a crime of violence); Count Six (attack to plunder a vessel); Count Seven (assault with a dangerous weapon on a federal officer or employee); Count Eight (performing an act of violence against an individual on a vessel); and Count Ten (using, carrying, and discharging a firearm during and in relation to a crime of violence).

challenging the sufficiency of the evidence faces a heavy burden, as "[r]eversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." United States v. Ashley, 606 F.3d 135, 138 (4th Cir. 2010) (internal quotation marks omitted).

1.

The defendants first challenge the sufficiency of the evidence on the § 1651 offense, which relates solely to their attack on the USS Ashland. In support of their sufficiency contention, the defendants reiterate the argument that piracy requires a robbery at sea. As we have explained, however, their position is foreclosed by Dire.

Furthermore, the government presented sufficient evidence to prove that the defendants' conduct constituted piracy under the Dire principles. The evidence established, inter alia, the following:

- The defendants set out from Somalia in their skiff with the intent to seize a merchant ship and tools to do so, including a hooked ladder, three AK-47s, and an RPG;

- Seeking to capture the USS Ashland in international waters, Cabaase fired multiple AK-47 rounds at the Ashland from the skiff. See Dire, 680 F.3d at 465 (explaining that piracy includes "(A)(1) any illegal act of violence . . . ; (2) committed for private ends; (3) on the high seas . . . ; (4) by the crew or the passengers of a private ship; (5) and directed against another ship, or against persons or

25

property on board such ship" (alterations and internal quotation marks omitted));

- Farah drove the skiff as the defendants hunted a ship to seize and then targeted the Ashland. See id. (further defining piracy as "(B)(1) any act of voluntary participation in the operation of a ship; (2) with knowledge of the facts making it a pirate ship" (alterations and internal quotation marks omitted); and

- Osman, along with Cabaase, had supplied two of the weapons, and Jama and Said, a leader and next in command for the mission, carried an RPG and an AK-47 during the Ashland attack. See id. (lastly defining piracy as "(C)(1) any act of inciting or of intentionally facilitating (2) an act described in subparagraph (A) or (B) (internal quotation marks omitted)); see also United States v. Shibin, 722 F.3d 233, 240 (4th Cir. 2013) (recognizing "that the facilitating conduct of [subparagraph (C)] is 'functionally equivalent' to aiding and abetting criminal conduct, as proscribed by 18 U.S.C. § 2").

Accordingly, we are well satisfied that, on the evidence presented, a reasonable jury was entitled to conclude beyond a reasonable doubt that each of the defendants committed the § 1651 piracy offense.

2.

Next, defendants Jama, Cabaase, Osman, and Farah challenge the sufficiency of the evidence on the conspiracy offenses charged in Counts One through Three, encompassing the time period in which the encounters with the HMS Chatham and the USS Ashland occurred. As for Counts One and Two, the operative indictment alleged that the defendants conspired to commit

26

hostage taking and kidnapping, in that they went to sea with the intent to hijack a ship and hold the vessel and its crew for ransom. See 18 U.S.C. § 1203(a) (proscribing conspiracy to commit hostage taking); id. § 1201(c) (same for conspiracy to commit kidnapping). These four defendants contend that there was insufficient evidence to prove that they conspired to kidnap or hold any person hostage for ransom. They assert that the evidence showed merely that they intended to seize a ship to make money.

Upon seizing a ship, however, the defendants would have had to either detain the crew members and personnel on board or throw them off the vessel. A reasonable jury could conclude that the defendants intended to pursue the former option — that is, detain the crew and other personnel — given that their shared goal was to "make money," and that they could do so by ransoming captives. See, e.g., J.A. 403 (Ibrahim's testimony that the defendants' mutual objective at the time of the USS Ashland attack was "[t]o seize a ship so we can make money"). That evidence, illustrating the defendants' thirst for funds, was sufficient to prove that the defendants conspired to profit by kidnapping and holding crew members and personnel hostage in exchange for ransom. Tellingly, there was no commonsense alternative offered to the jury. Although these defendants now contend that they might have intended to make money by, for

27

example, selling the seized ship, they did not argue such a theory, or present any evidence supporting it, at trial. Indeed, the defense focused on convincing the jury that the defendants were smugglers rather than pirates.

Turning to Count Three, the operative indictment alleged that the defendants conspired to perform an act of violence against an individual on a vessel, and that such act of violence was likely to endanger the safety of those on board. See 18 U.S.C. § 2291(a)(9) (criminalizing conspiracy to "do anything prohibited under paragraphs (1) through (8)," including performing act of violence against individual on vessel, as proscribed by paragraph (6)). Jama, Cabaase, Osman, and Farah contend that their mere intent to seize a ship does not also prove an intention to perform an act of violence against the ship's crew or other personnel. Rather, according to these defendants, "[o]ne might seize a vessel by surprise or acquiescence." See Br. of Cross-Appellants 59.

The trial evidence, however, was more than sufficient to prove that, at the time of the encounters with the HMS Chatham and the USS Ashland, the defendants were equipped and ready to commit violence against individuals on board in furtherance of their goal of seizing a ship. During the Ashland attack, they carried an RPG and three AK-47s — two provided by Cabaase and Osman — in their small, open skiff. While Farah drove the skiff

28

into position, Jama attempted to load the RPG, and Cabaase fired multiple rounds from his AK-47 at the Ashland in order "to capture the ship." See J.A. 444. From that evidence, a reasonable jury could conclude that these defendants conspired to perform an act of violence against an individual on a vessel, as part of their plan to forcibly seize a ship.

In these circumstances, the guilty verdicts on Count Three, as well as Counts One and Two, were adequately supported by the evidence. Because we therefore must affirm the convictions of Jama, Cabaase, Osman, and Farah on Counts One through Three, we also uphold Jama's and Cabaase's convictions on Count Nine.

## III.

Having resolved each defendant's appeal against him, we turn to the government's appeal from the district court's Eighth Amendment Order. The government contends that the court erroneously determined that 18 U.S.C. § 1651's mandatory life sentence, as applied to the defendants, contravenes the Eighth Amendment's prohibition against cruel and unusual punishment. The defendants, by contrast, maintain that the court properly imposed non-life sentences for their piracy offenses. We review de novo the question of whether a sentence runs afoul of the Eighth Amendment. See United States v. Cobler, 748 F.3d 570, 574 (4th Cir. 2014).

A.

We begin our consideration of the government's appeal by identifying the controlling legal framework. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In deciding whether a punishment is cruel and unusual, we must examine the "evolving standards of decency that mark the progress of a maturing society." Graham v. Florida, 560 U.S. 48, 58 (2010) (internal quotation marks omitted). A punishment is cruel and unusual not only when it is "inherently barbaric," but also when it is "disproportionate to the crime." Id. at 59. Indeed, "[t]he concept of proportionality is central to the Eighth Amendment." Id.

Here, the defendants pursued as-applied challenges to § 1651's mandatory life sentence. See Cobler, 748 F.3d at 575 ("Under an as-applied challenge, a defendant contests the length of a certain [non-capital] sentence as being disproportionate given all the circumstances in a particular case." (internal quotation marks omitted)). As the district court recognized in its Eighth Amendment Order, the Supreme Court has adopted a two-prong test for assessing an as-applied challenge to the proportionality of a sentence. Under prong one, a court must determine whether a threshold comparison of "the gravity of the

30

offense and the severity of the sentence" produces "an inference of gross disproportionality." See Graham, 560 U.S. at 60 (internal quotation marks omitted) (relying on principles set forth in Solem v. Helm, 463 U.S. 277 (1983)). If prong one is satisfied, the court moves to an analysis of prong two. Under that prong, the court must "compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." Id. If that comparison "validates an initial judgment that the sentence is grossly disproportionate, the sentence is cruel and unusual." Id. (alterations and internal quotation marks omitted).

The Supreme Court has on one occasion — in its Solem decision of 1983 — identified a non-capital sentence as being grossly disproportionate. There, the recidivist defendant (Helm) was sentenced to life without parole for uttering a $100 bad check. The Court observed that the matter involved "one of the most passive felonies a person could commit," in that the offense "involved neither violence nor threat of violence to any person"; Helm's prior offenses "were all relatively minor"; and life imprisonment was "the most severe punishment that the State could have imposed on any criminal for any crime." See Solem, 463 U.S. at 296-97 (internal quotation marks omitted). The Court further determined that "Helm has been treated in the same

31

manner as, or more severely than, criminals [in the same jurisdiction] who have committed far more serious crimes," and that "Helm was treated more severely than he would have been in any other State" except possibly one. See id. at 299-300. In those circumstances, the Court concluded that Helm's life sentence was "significantly disproportionate to his crime" and "therefore prohibited by the Eighth Amendment." Id. at 303. The Solem decision emphasized, however, that "outside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare." Id. at 289-90 (alteration, emphasis, and internal quotation marks omitted).

Since Solem was decided, not a single "defendant before the Supreme Court has been successful in establishing even a threshold inference of gross disproportionality" in a non-capital case. See Cobler, 748 F.3d at 576. For example, in Harmelin v. Michigan, 501 U.S. 957 (1991), the Court rejected an as-applied Eighth Amendment challenge to a mandatory life sentence in a cocaine possession case. Justice Kennedy distinguished the "passive" check fraud crime in Solem from the "pernicious" drug offense at issue in Harmelin, observing that the latter crime "threatened to cause grave harm to society." See Harmelin, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment) (internal quotation marks

32

omitted).[11]  In rejecting Harmelin's Eighth Amendment challenge, Justice Kennedy also stressed the proposition that courts should give "substantial deference" to legislatures in determining the severity of punishments.  See id. at 998-99 (internal quotation marks omitted).

The Supreme Court has more recently rejected an as-applied Eighth Amendment challenge for lack of an inference of gross disproportionality in Ewing v. California, 538 U.S. 11 (2003). Ewing received a sentence of twenty-five years to life under California's "three strikes" law for stealing $1,200 worth of golf clubs.  Distinguishing his crime from that in Solem, the Court observed that the theft offense "was certainly not one of the most passive felonies a person could commit."  See Ewing, 538 U.S. at 28 (internal quotation marks omitted).  The Court then explained that, although Ewing's sentence was "a long one[,] . . . it reflect[ed] a rational legislative judgment,

---

[11] Although a majority failed to coalesce in Harmelin concerning the scope of the Eighth Amendment's proportionality guarantee, Justice Kennedy's opinion, which was joined by two of his colleagues, has been recognized by the Supreme Court as the controlling decision on that issue. See Graham, 560 U.S. at 59-60.  It is thereby established that "the Eighth Amendment contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.'"  Id. (quoting Harmelin, 501 U.S. at 997, 1000-01 (Kennedy, J., concurring in part and concurring in the judgment)).

entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated." Id. at 30.

By our subsequent Cobler decision, we upheld a 120-year sentence imposed on a defendant who not only "possess[ed] large quantities of child pornography that he downloaded and shared on the Internet," but "also created depictions of his own sexual exploitation, molestation, and abuse of a four-year-old child." See 748 F.3d at 580. Applying the Supreme Court's two-prong test for an as-applied Eighth Amendment challenge, Cobler failed at prong one. We explained:

> Given the shocking and vile conduct underlying these criminal convictions, we hold that Cobler has failed to substantiate the required threshold inference of gross disproportionality. Even assuming, without deciding, that Cobler's 120-year term of imprisonment is functionally equivalent to a sentence of life imprisonment without the possibility of parole, we conclude that Cobler's multiple child pornography crimes are at least as grave as the drug offense in Harmelin, which the Supreme Court deemed sufficiently egregious to justify a similar sentence.

Id. (footnote omitted). Judge Keenan emphasized the rarity of cases in which an inference of gross disproportionality may be drawn, noting the singularity of the Supreme Court's Solem decision and distinguishing the check fraud offense there from the crimes perpetrated by Cobler. See id. ("Far from being 'one of the most passive felonies a person could commit,' Cobler's

34

heinous acts exploited, injured, and inflicted great harm on a most vulnerable victim." (quoting Solem, 463 U.S. at 296)).

On the issue of gross disproportionality, Cobler is typical of this Court's decisions.[12] Significantly, we have not identified a grossly disproportionate life sentence or putative life sentence in the wake of Solem. See, e.g., United States v. Dowell, 771 F.3d 162, 167-69 (4th Cir. 2014) (eighty-year sentence for child pornography); United States v. Myers, 280 F.3d 407, 415-16 (4th Cir. 2002) (life sentence imposed under Armed Career Criminal Act for being felon in possession of firearm); United States v. Kratsas, 45 F.3d 63, 68-69 (4th Cir. 1995) (repeat drug offender's life sentence for conspiracy to distribute cocaine); United States v. D'Anjou, 16 F.3d 604, 612-14 (4th Cir. 1994) (life sentence for conspiracy to distribute cocaine base).

---

[12] Our Cobler decision was rendered in April 2014 — nearly two months after the district court had entered its Eighth Amendment Order in this case. The district court, upon being presented with Cobler, responded at defendant Said's sentencing hearing on May 14, 2014, that it

> read [Cobler and] understands that there has not been any precedent that would appear favorable to what the [Eighth Amendment Order] has ruled, but the precedent is usually the precedent until the precedent changes.

J.A. 1104.

35

With the foregoing legal framework in mind, we assess the government's challenge to the defendants' non-life sentences for their § 1651 piracy offenses. Prong one of the applicable analysis requires that we decide whether a threshold comparison of the gravity of the defendants' offenses and the severity of the proposed life sentences leads to an inference of gross disproportionality. See Graham, 560 U.S. at 60. The defendants contend that life sentences would be grossly disproportionate to their conduct, which, echoing the district court, they describe as mere "attempted robbery on the high seas" that "resulted in no property damage to the USS Ashland and no physical harm to any of its occupants." Br. of Cross-Appellants 39.

As discussed above, however, the defendants' § 1651 piracy offenses included committing illegal acts of violence for private ends (Cabaase), operating a pirate ship (Farah), and otherwise facilitating the violent acts (Said, Jama, and Osman). When the defendants engaged in that conduct, their piracy offenses were complete. Those offenses were hardly "passive"; rather, they involved "violence []or threat[s] of violence to [m]any person[s]." See Solem, 463 U.S. at 296. Indeed, the defendants' violent conduct was at least as severe as the cocaine possession in Harmelin. It is of no moment that no one aboard the USS Ashland was harmed before the defendants' attack

36

was thwarted. Cf. Dowell, 771 F.3d at 169 ("We reject out of hand the notion that the sexual abuse of a child can be considered nonviolent merely because it does not lead to physical or life-threatening injuries."). That is, "[t]he mere fact that [the defendants'] acts of [violence] did not inflict . . . physical injury [to the Ashland's personnel] does not render [life sentences] disproportionate." See id.[13]

Furthermore, § 1651's mandatory life sentence "reflects a rational legislative judgment, entitled to deference," that piracy in international waters is a crime deserving of one of the harshest of penalties. See Ewing, 538 U.S. at 30. The government has helpfully and cogently detailed why such an offense is sufficiently grave to merit life imprisonment. Above all, "for centuries, pirates have been universally condemned as hostis humani generis — enemies of all mankind — because they attack vessels on the high seas, and thus outside of any nation's territorial jurisdiction, with devastating effect to global commerce and navigation." United States v. Dire, 680 F.3d 446, 454 (4th Cir. 2012) (alterations and internal quotation marks omitted). Piracy was of such significance to the Framers that they expressly accorded Congress, in what is

---

[13] Of course, the defendants' attack on the USS Ashland was not casualty-free. The Engineer was killed and the defendants suffered burns when the Ashland returned fire.

known as the Define and Punish Clause, the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. In 1790, the First Congress created a series of crimes related to piracy, many of which were punishable by death. The piracy offense proscribed by § 1651 carried a mandatory death sentence from the offense's inception in 1819 until 1909, when Congress reduced the penalty to mandatory life.

The prevailing definition of piracy, "spelled out in the UNCLOS, as well as the High Seas Convention before it, has only been reaffirmed in recent years as nations around the world have banded together to combat the escalating scourge of piracy." Dire, 680 F.3d at 469. From 2005 to the fall of 2010, for example, Somali pirates hijacked approximately 170 vessels and fired upon some 280 more. See J.A. 952-53 (expert testimony at November 2010 trial of Dire defendants). Then, "[i]n 2011, armed Somali pirates attacked an estimated 3,863 seafarers and took some 555 individuals hostage." See United States v. Beyle, 782 F.3d 159, 162 (4th Cir. 2015). As Judge Wilkinson aptly explained in the Beyle decision,

> [t]he United States and its allies are engaged in a
> multinational battle against piracy in the waters off
> the Horn of Africa. Through the Gulf of Aden and much
> of the Indian Ocean, Somalia-based pirates have
> launched attacks against commercial and recreational
> vessels, from large freighters to personal yachts.
> Piracy poses a threat not only to the free flow of

38

> global commerce, but also to the individuals who navigate the seas.

Id. (citation omitted). Victims of piracy are robbed of their vessels, kidnapped, held hostage, and even tortured and murdered, while pirates are often able to find safe refuge in the territorial waters off Somalia and collect multi-million-dollar ransom payments. In these circumstances, we agree with the government "that Congress could with reason conclude [that piracy] calls for the strong medicine of a life sentence for those who are apprehended." See Br. of Appellant 39.[14]

We are satisfied that "the relationship between the gravity of [the defendants'] offenses and the severity of [their proposed] punishment fails to create the threshold inference of gross disproportionality that is required" to satisfy prong one of the Eighth Amendment analysis. See Cobler, 748 F.3d at 580.

---

[14] The defendants contend on appeal that we should not afford deference to Congress's judgment that piracy should be punished by life imprisonment, because when that penalty was fixed in 1909, the definition of piracy was limited to robbery at sea and did not include their violent conduct. For that same reason, the defendants also assert that imposing life sentences on them would violate the Define and Punish Clause. We must reject the defendants' theory, however, because Congress clearly meant to attach the mandatory life sentence to piracy, however defined by the law of nations at the relevant time. See Dire, 680 F.3d at 468-69 (recognizing that "§ 1651 incorporates a definition of piracy that changes with advancements in the law of nations," and that, in enacting § 1651, "Congress properly made an act a crime, affixed a punishment to it, and declared the court that shall have jurisdiction of the [offense]" (alterations and internal quotation marks omitted)).

Thus, without moving to prong two, we rule that the district court erred in invalidating § 1651's mandatory life sentence as to these defendants and is obliged to impose such sentences on remand.

IV.

Pursuant to the foregoing, we affirm the various convictions of the defendants. We, however, reverse the Eighth Amendment Order, vacate the defendants' sentences, and remand for resentencing.

No. 14-4413 <u>REVERSED IN PART, VACATED IN PART, AND REMANDED</u>

Nos. 14-4420, 14-4421, 14-4423, 14-4424, and 14-4429 <u>AFFIRMED</u>

DAVIS, Senior Circuit Judge, concurring:

I join in full Judge King's excellent opinion. I write to express my agreement with one thoughtfully-expressed and eminently correct observation by the district court: Although modern piracy is a genuine, life-threatening scourge, not all piracy offenses are equal in severity, in heinousness, and in the dire consequences visited on innocent seafarers. Nor are all those who participate in such offenses deserving of life in prison as the sole conceivable "rational" punishment.* The civilized world knows this. The United States of America knows this too, but has not yet elected to act on that knowledge. Accordingly, because we are not legislators, and as Judge King demonstrates, because the Constitution has remarkably little to say about severe, but non-capital, criminal punishments, our hands are tied.

Perhaps, in the fullness of time, Congress will act on the certain knowledge we all share about criminal offenses and their punishments, and thereby empower federal district judges (and

_____

* Indeed, in this case, Mr. Ibrahim, who was "the group's leader" and who "led the new mission," ante at 7, would seem to have earned a life sentence. But he avoided that fate through the magic of "substantial assistance" and the fiction of "acceptance of responsibility," the coins of the federal prosecutorial realm. The inference is unavoidable that it is not really those who participate in piracy who receive a life sentence upon conviction (as we imagine Congress might believe), but rather those who are convicted after electing to go to trial.

41

not simply federal prosecutors) with discretion to fashion more individualized punishments in this small corner of federal criminal justice.